IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-11356
_____

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                                    Plaintiff-Appellee,

                    versus

EXXON CORPORATION,

                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

February 11, 2000

Before HIGGINBOTHAM and SMITH, Circuit Judges, and DUPLANTIER,
District Judge.[*]

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     In this appeal under the Americans with Disabilities Act
("ADA"), we review the measure of a safety-based qualification
standard defended as a business necessity.  The EEOC moved for
partial summary judgment arguing that the only defense available
under the ADA when an employer imposes a safety qualification
standard is for the employer to prove that the individual poses a
"direct threat."  The district court granted the motion.  We are

_____

     [*] District Judge of the Eastern District of Louisiana, sitting
by designation.

not persuaded by the position of the EEOC and accepted by the district court. Rather, we find that applying direct threat only in cases in which the employer imposes a special safety standard in an individual case offers a more coherent meaning of the statute and of the role of safety under it. We REVERSE.

I

The EEOC brought this suit on behalf of certain Exxon employees, alleging that Exxon's substance abuse policy violates the ADA. The policy permanently removes any employee who has undergone treatment for substance abuse from certain safety-sensitive, little-supervised positions. The policy affects about ten percent of Exxon's positions. Exxon adopted the policy in response to the 1989 Exxon Valdez incident, in which one of its tankers ran aground, causing environmental injury and resulting in billions of dollars of liability for Exxon. Concerns arose that the tanker's chief officer's alcoholism, which had previously been treated, might have contributed to the accident.

The EEOC claims that pursuant to the policy, Exxon demoted employees who underwent treatment several decades ago. Exxon justifies its policy as promoting safety in jobs in which it is unable to oversee employees to ensure they are not relapsing into substance abuse, as well as furthering environmental protection, the prevention of future tort liability, and good corporate citizenship. Before trial, the EEOC moved for partial summary

2

judgment on the grounds that Exxon must defend its policy under the "direct threat" provision of the ADA. The magistrate judge recommended summary judgment for the EEOC, and the district court adopted that recommendation but acknowledged the difficulty and certified the issue for appeal. We granted leave to Exxon to appeal the interlocutory order under 28 U.S.C. § 1292(b).

II

The ADA prohibits an employer from using qualification standards that screen out a disabled individual or class. See 42 U.S.C. § 12112(b)(6) (1999). An employer may raise certain affirmative defenses to such a charge.[1] The relevant portions of the statute's "Defenses" provision read:

> (a) In general
>   It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards . . . that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity. . . .
>
> (b) Qualification standards
>    The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

§ 12113. Safety-based qualification standards are an accepted ground for a defense; the question before us is whether an employer may defend the questioned personnel decision as based on a standard

---

[1] Whether the employees on whose behalf the EEOC is suing are "disabled" within the meaning of the ADA is not before us.

justified as a business necessity or must demonstrate a "direct threat" in each circumstance.[2]

Exxon contends that because the statute does not explicitly mandate the direct threat test for every safety-based qualification standard, it may defend its policy under either section of the provision. The EEOC argues that the direct threat test must be used in every case where a safety-based requirement is at issue. The EEOC has issued Interpretive Guidance, which generally requires employers to meet the direct threat test:

> With regard to safety requirements that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, an employer must demonstrate that the requirement, as applied to the individual, satisfies the "direct threat" standard in § 1630.2(r) in order to show that the requirement is job-related and consistent with business necessity.

29 C.F.R. pt. 1630, App. § 1630.15(b) & (c). This language, not being part of the regulation, is not entitled to Chevron deference. Rather, we will give it due deference to the extent it is reasonable and harmonizes with the plain language of the statute, its origin and purposes. Cf. Fort Hood Barbers Ass'n v. Herman,

---

[2] Exxon also cites its concern for the environment as a ground for the policy. We find this justification subsumed in the safety motivation. Exxon further claims that tort liability should be a separate basis for a business necessity defense. Exxon faced massive tort liability as a result of the Valdez spill and claims that should another incident occur, it would be subject to heightened damages, including punitive and criminal sanctions. In International Union v. Johnson Controls, Inc., the Supreme Court noted that tort liability might be a valid defense if the added costs would threaten the survival of the employer's business. 499 U.S. 187, 210-11 (1991).

137 F.3d 302, 307 (5th Cir. 1998) (construing deference appropriate for an interpretive regulation).

Our review begins with the language of the provision itself. Two aspects of the provision indicate that safety requirements are not exclusively cabined into the direct threat test. First, § 12113(a) speaks of qualification standards that "screen out or tend to screen out an individual." This language suggests a general standard applicable to all employees. In contrast, the direct threat provision of § 12113(b), phrased in the permissive, allows a requirement that the individual not pose a threat to health or safety. The different approaches suggest that business necessity applies to across-the-board rules, while direct threat addresses a standard imposed on a particular individual.

This reading is confirmed by the language in § 12113(b) stating that the individual shall not pose a direct threat to "others in the workplace." This language appears odd, if we are to accept the EEOC's interpretation that all safety-related qualification standards are addressed by this provision. Many employees who pose safety risks, such as a driver unqualified to transport hazardous substances, would not pose a particular threat to others in their workplaces.

The origin of the workplace language sheds light on what problem § 12113(b) seeks to remedy. The direct threat provision derives from School Board of Nassau County v. Arline, 480 U.S. 273 (1987), in which the Supreme Court construed the ADA's predecessor

5

Rehabilitation Act.  See H.R. REP. No. 101-485(II), at 56-57 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 338-39.  In Arline, the plaintiff, a teacher battling tuberculosis, was fired after concerns arose that her students would become infected.  The teacher met all of the established qualification standards relating to the performance of her job.  The Court held that the plaintiff was not qualified for her position because of her illness only if she posed a significant risk to others in the workplace.  See Arline, 480 U.S. at 276, 284, 287.

When Congress codified Arline in the ADA, it kept the workplace language but expanded coverage to individuals with disabilities other than contagious illnesses.  The legislative history's examples of direct threat, however -- contagious illnesses, mental disabilities, and mental illnesses -- continue the focus on situations in which an employer might impose a safety standard in an individual's particular case separate from the general qualification standards required for the position.  See H.R. REP. No. 101-485(III), at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468-69 & n.37.

Neither the statute, the legislative history, nor Arline discusses the distinct situation in which a pre-existing safety-based qualification standard applies across-the-board for the position, such as a requirement that a bus driver meet certain sight requirements.  Such requirements arise in safety-sensitive jobs such as driving or working with hazardous substances.  See,

e.g., <u>Albertsons, Inc. v. Kirkingburg</u>, 1999 WL 407456, at *1 (U.S. 1999) (company imposed vision requirements on truck drivers). In cases where an employer has developed a general safety requirement for a position, safety is a qualification standard no different from other requirements defended under the ADA's business necessity provision. <u>See</u> 29 C.F.R. § 1630.2(q). Physical requirements, for example, such as lifting, walking or seeing, are acceptable defenses as long as the requirements are job-related and consistent with business necessity. <u>See</u> 29 C.F.R. pt. 1630, App. § 1630.10. Requirements that may be valid as a business necessity must be "established" by the employer to be eligible for the position. <u>See</u> 29 C.F.R. § 1630.2(q).

Similarly, the business necessity defense under Title VII and the ADEA has applied to safety-based qualification standards which tend to screen out women or certain age groups. <u>See</u> <u>Smith v. City of Des Moines</u>, 99 F.3d 1466, 1471 (8th Cir. 1996) (applying business necessity standard in an ADEA suit regarding safety standards for firefighters); <u>Levin v. Delta Air Lines, Inc.</u>, 730 F.2d 994, 997 (5th Cir. 1984) (applying business necessity in a Title VII challenge to safety requirements affecting pregnant women). In these areas of employment discrimination law, the strength of the defense again turns on whether the employer can justify the safety standard as a general rule. <u>See</u> <u>Smith</u>, 99 F.3d at 1472-73 (examining validity of qualification standard rather

7

than experts' opinions as to plaintiff's general fitness for position).

While no court has as yet addressed the question we answer today, several trends in ADA case law indicate that the direct threat test is not deployed where an employer uses a general safety-based qualification standard applicable across-the-board.[3] See, e.g., Jeffrey A. Van Detta, "'Typhoid Mary' Meets the ADA: A Case Study of the 'Direct Threat' Standard Under the Americans With Disabilities Act," 22 HARV. J.L. PUB. POL'Y 849, 935 (1999) (noting tendency of courts to ignore Arline in cases relating to transportation jobs). Several cases have held that an employee is "not qualified," without discussing direct threat, if the employee cannot meet an established safety requirement for the position. See, e.g., Jones v. Kerrville State Hosp., 142 F.3d 263, 265-66 (5th Cir. 1998) (holding that nurse who was unable to complete training on safe subduing of patients was not qualified); Newman v. Chevron U.S.A., 979 F. Supp. 1085, 1090-91 (S.D. Tex. 1997) (gasoline truck driver with post traumatic stress disorder not qualified). Because the "otherwise qualified" analysis and the

---

[3] The Supreme Court also recently questioned the EEOC's claim for exclusive use of the direct threat standard. In dicta in Albertsons, Inc. v. Kirkingburg, Justice Souter questioned the soundness of the EEOC's position requiring a showing of "direct threat" to justify a safety-related qualification standard. 1999 WL 407456, at *7 n.15 (U.S. 1999). At issue in Albertsons was a truck driver with monocular vision who failed his employer's vision standards. The EEOC argued that the employer would have to proceed under the direct threat standard. The Court, however, decided the case on other grounds. See Albertsons, 1999 WL at *1, *7.

business necessity defense each involves whether the individual can perform the "essential functions" of the job, see 42 U.S.C. § 12111(8); 29 C.F.R. pt. 1630, App. § 1630.10, these courts' approach mirrors the business necessity standard.

We have found nothing in the statutory language, legislative history or case law that persuades that the direct threat provision addresses safety-based qualification standards in cases where an employer has developed a standard applicable to all employees of a given class. We hold that an employer need not proceed under the direct threat provision of § 12113(b) in such cases but rather may defend the standard as a business necessity. The direct threat test applies in cases in which an employer responds to an individual employee's supposed risk that is not addressed by an existing qualification standard.

In so holding, we note that direct threat and business necessity do not present hurdles that comparatively are inevitably higher or lower but rather require different types of proof. Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability. See 29 C.F.R. § 1630.2(r). In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement. Either way, the proofs will ensure that the risks are real and not the product of stereotypical assumptions.

In evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, the court

9

should take into account the magnitude of possible harm as well as the probability of occurrence.  The acceptable probability of an incident will vary with the potential hazard posed by the particular position:  a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example.  In short, the probability of the occurrence is discounted by the magnitude of its consequences.  In Exxon's case, the court should thus consider the magnitude of a failure in assessing whether the rate of recidivism among recovering substance abusers constitutes a safety risk sufficient for business necessity.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.