Jana L. MORTON, Plaintiff–Appellant,

v.

**UNITED PARCEL SERVICE, INC., Defendant–Appellee.**

No. 99–17447.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 2001

Filed Nov. 30, 2001

Marc P. Charmatz, Mary C. Vargas and Sarah S. Geer, National Association of the Deaf Law Center, Silver Spring, Maryland, Suzanne M Dohrer, Dohrer & Watts, P.L.C., Phoenix, Arizona, for the plaintiff-appellant.

Patricia S. Radez, Gibson, Dunn & Crutcher LLP, San Francisco, California, for the defendant-appellee.

Before: REINHARDT, TASHIMA and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Jana Morton appeals from the district court's order granting summary judgment for defendant-appellee United Parcel Service ("UPS") on her claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. We reverse.

## I. Background

Morton was employed in Phoenix by UPS from 1992 until her resignation in June 1996. She was initially employed as a part-time warehouse worker, with duties including sorting packages and loading and unloading vehicles. Morton was honored by UPS as "Employee of the Month" on four separate occasions between 1992 and 1994. In February 1995, she applied for the position of "package car driver," a full-time position which is the primary route to advancement at UPS.

The Department of Transportation ("DOT") regulates vehicles with a gross vehicle weight rating in excess of 10,000 pounds. Professional drivers who drive such vehicles are required by federal law to be certified by DOT. 49 C.F.R. §§ 390.5, 391.41(b). UPS has a policy of hiring for driving positions only individuals who have obtained DOT certification.

Morton is severely hearing impaired, which precludes her from obtaining DOT certification.[1] Thus, although she successfully passed UPS's driving and written tests—two of the three prerequisites for promotion to package car driver—she was denied the promotion because she was unable to meet the physical requirements to obtain DOT certification.[2] When Morton was informed that she would not be hired as a driver because of her hearing impairment, she asked her supervisor if she could be hired and permitted to drive only non-DOT vehicles (those with gross vehicle weight under 10,001 pounds). Consistent with UPS's policy, this request was refused.

Most packages delivered by UPS are carried by drivers on fixed routes, assigned pursuant to a seniority-based bidding process under the terms of UPS's collective bargaining agreement with the Teamsters Union. All of UPS's drivers hold the title of package car driver, although the duties of package car drivers vary based on seniority. The collective bargaining agreement covering drivers provides that when a new route is created, it will be posted for bidding and assigned to the most senior package car driver who bids for it. The least senior drivers work as unassigned, or "swing", drivers until they accrue enough seniority to bid successfully on a fixed route.

---

1. Morton is not completely deaf. She was, however, rated as "profoundly deaf" in a hearing test administered in conjunction with her application for a driving position. Morton, who uses two hearing aids, testified that she can hear car horns and spoken voices, although she cannot make out specific words in conversation without the assistance of lip reading.

Over a period of 15 years, Morton has regularly driven outside of work vehicles similar to the non-DOT trucks and vans used by UPS.

2. Although UPS refuses to hire new drivers who are not DOT-certified, there is evidence that the company has accommodated individuals who became disabled (and ineligible for DOT certification) while already employed as drivers, by restructuring their routes so that they could make deliveries using non-DOT vehicles.

UPS operates five geographic "centers" in Phoenix, each of which maintains a separate seniority list for full-time drivers. The swing drivers in a particular geographic center fill in on that center's assigned routes when the drivers assigned to those routes are on vacation or otherwise absent. In addition, the record indicates that package loads on fixed routes vary from day to day and that swing drivers handle overflow work. There is also evidence that on days when there is insufficient driving work to occupy all of the swing drivers, UPS assigns them to non-driving work, such as warehouse work.

At the relevant time, UPS operated 254 fixed routes in the Phoenix area, of which approximately 5.5% (14 routes) were served by non-DOT vehicles. During this same time period, UPS employed approximately 313 package car drivers in the Phoenix area, of whom roughly 80% drove on fixed routes while 20% worked as swing drivers. According to the record, the routes that use the smaller vehicles are generally the more rural and residential routes, requiring more driving between deliveries and typically featuring smaller packages and fewer packages at each stop. The non-DOT vehicle routes are considered more desirable by drivers because of their location and lighter load and are thus generally held by the more senior drivers. Of the 96 drivers hired in Phoenix since February 1995, 30 have successfully bid on assigned routes, but none has successfully bid on one of the 14 routes delivered with non-DOT vehicles.

Although only 14 fixed routes were served by non-DOT vehicles during the relevant time period, UPS operated approximately 33 non-DOT vehicles in the Phoenix area. Some of those extra vehicles were maintained as backup vehicles for use when other vehicles were out for

repairs. Others were used by swing drivers to handle "overflow" work, generated by the fluctuating day-to-day demand on certain routes. Further, there was evidence that routes and vehicles assigned to a particular route may be modified from day to day "to meet delivery needs."

After Morton filed suit alleging that UPS failed to accommodate her and failed to engage in the interactive process required by the ADA, UPS moved for summary judgment. On October 6, 1999, the district court granted UPS's motion for summary judgment, on the grounds that no reasonable accommodation was available and that Morton could not perform the essential functions of the job of package car driver.[3]

## II. Analysis

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). An individual is a "qualified individual with a disability" if she can perform the essential functions of the position that she holds or desires, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Kennedy v. Applause,* 90 F.3d 1477, 1481 (9th Cir.1996); *see also Cripe v. City of San Jose,* 261 F.3d 877, 884 (9th Cir.2001). It is an act of discrimination to fail reasonably to accommodate a qualified employee with a disability unless the employer can show that such an accommodation would impose an undue hardship. *See* 42 U.S.C. § 12112(b)(5)(A); *see also McAlindin v. County of San Diego,* 192 F.3d 1226, 1236 (9th Cir.1999), *amended by,* 201 F.3d 1211 (9th Cir.), *cert. denied,* 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000); *Braunling v. Countrywide Home*

---

3. Morton's motion for summary judgment was denied by the district court. This aspect of the district court's decision is not presently before us on appeal.

*Loans Inc.*, 220 F.3d 1154, 1157 (9th Cir. 2000).

UPS concedes that it refused to promote Morton to the position she sought solely on account of her hearing impairment, and does not dispute that the impairment constitutes a disability for purposes of the ADA. So the issues for decision concern UPS's contentions that the ADA permits it to refuse to hire Morton as a package car driver because (1) it would not be possible to accommodate Morton without violating the seniority provisions of the collective bargaining agreement; (2) Morton is not a "qualified individual" because the ability to drive DOT-certified cars is an essential function of the job of package car driver; (3) accommodating Morton would constitute an undue hardship; and (4) employing only DOT-certified individuals as drivers is a safety-related "business necessity" for UPS. In this complex statute with its layers of seemingly redundant employer defenses, sorting out the appropriate roles of these various defenses poses some interesting quandaries, as we shall see.

### A. The collective bargaining agreement

■ The focus of the district court opinion was its holding that no reasonable accommodation was available within the terms of the collective bargaining agreement. Although the "reasonable accommodation" issue logically arises only after

one has determined that the individual seeking relief is "qualified," it is more orderly for present purposes to begin with the issues the district court addressed and then proceed to the ones it did not. Reviewing it de novo, *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133–34 (9th Cir.2001), we find no support in the record for the district court's reasonable accommodation finding.

Although some potential accommodations (such as assigning Morton to a route using a non-DOT vehicle, an assignment which she lacks sufficient seniority to obtain in the bidding process) would conflict with the collective bargaining agreement, others would not. In particular, the requirements of the collective bargaining agreement in no way conflict with the accommodation actually requested by Morton—employment as a swing driver of only non-DOT vehicles.[4]

The collective bargaining agreement requires UPS to make any new full-time route available via the seniority-based bidding process. Thus, even though reasonable accommodation "may include ... job restructuring ... or modified work schedules," 42 U.S.C. § 12111(9)(B), under the seniority provisions of the collective bargaining agreement, UPS could not accommodate Morton by creating a new full-time fixed route specifically for her. Other employees would have the right to bid on any

---

**4.** The record indicates that, under a collective bargaining agreement that became effective in 1997, UPS must allocate swing driver assignments that are expected to last more than a week via a seniority-based bidding process among available swing drivers. While this change may affect how much non-DOT swing driving work is available for UPS to assign to drivers, like Morton, who are not DOT-certified, for liability purposes the change is irrelevant: The record indicates that in February 1995, when UPS refused to hire Morton as a driver, the company had unlimited discretion with respect to allocation of swing driving assignments among swing drivers as well as with respect to assignment of particular vehicles to routes. Moreover, had UPS hired her in 1995, Morton would have had two years' seniority for purposes of bidding on those swing driving assignments open to bidding under the 1997 collective bargaining agreement. The impact of the 1997 amendments therefore pertains only to prospective relief. Whether the amendment in fact significantly affects the availability of the prospective accommodation that Morton seeks, if any, can be considered at that stage, should liability be established at trial.

such newly created route, and more senior employees would presumably prevail over Morton because the route would, for the reasons outlined above, be regarded as a desirable one. *See Willis v. Pacific Mar. Ass'n,* 244 F.3d 675, 679–80 (9th Cir.2001).

Nothing in the collective bargaining agreement, however, prevents UPS from accommodating Morton by hiring her as a swing driver and assuring that she is assigned to drive only non-DOT vehicles. The record establishes that the collective bargaining agreement does not limit UPS's authority with respect to assigning vehicles; it is only the allocation among drivers of the fixed geographic routes that is affected by the seniority provisions of the collective bargaining agreement. *Compare id.* at 679 (noting that plaintiffs "do not contend nor have they demonstrated that alternative accommodations may have been available outside the seniority provisions of the collective bargaining agreement."). For this reason, and because swing drivers in 1995 had no entitlement to choose among swing driving assignments according to seniority (and after 1997 have only a limited right to do so), any requirement that UPS accommodate Morton by structuring swing driving assignments to ensure that she could drive a non-DOT vehicle would not violate the collective bargaining agreement.

We conclude that Morton's requested accommodation, whether or not otherwise mandated by the ADA, in no way implicates the seniority provisions of the collective bargaining agreement.

## B. Essential Function/Reasonable Accommodation/Undue Hardship

■ UPS argues, and the district court held, that for logistical reasons relating to scheduling, UPS is justified in treating the

ability to drive every UPS vehicle as an essential function of the job of package car driver. Thus, according to UPS, Morton is not a "qualified individual," because she is unable to drive the approximately 90% of UPS's vehicles that are regulated by DOT. The district court agreed with UPS's contention that it would be "impossible to provide Morton with full-time work as a swing driver driving only light weight vehicles."

In this court, UPS makes its argument concerning the need to drive DOT-regulated vehicles in the guise of both an essential function argument—that Morton simply could not do the job—and an undue hardship defense—that the requested accommodation entails burdensome practical difficulties.[5] Both arguments depend on the same factual assertions. *Cf. Cripe,* 261 F.3d at 885 n. 7 (noting that essential function and undue hardship analyses often overlap). In reviewing the summary judgment record, we have determined that there are controverted issues of fact on these two issues. On this record, a jury could find both that a driver without DOT certification could perform the essential functions of the swing driver job with accommodation, and that the accommodation was not unduly burdensome on UPS. Thus, the grant of summary judgment based on the essential function argument was erroneous, and we will not affirm based on UPS's alternative undue hardship argument.

More specifically: Although consideration is given to the employer's view as to the essential functions of a job, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Id.* at 887 (citation omitted).

---

5. The district court did not rule on UPS's undue hardship argument, as it granted summary judgment on the "essential functions" issue.

A job's "essential functions" are its "fundamental" duties, not the "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The record contains conflicting evidence as to whether the ability to drive UPS's larger trucks is an essential function of the package car driver position.

The evidence favorable to UPS includes declarations from UPS personnel stating that it would not be possible to keep a swing driver fully occupied with driving assignments if she were precluded from driving DOT vehicles. Assuming, however, that a finding to this effect would establish that driving DOT vehicles is an essential function of the package car driver position, factual details contained in the record are inconsistent with the very general assertions in support of such a finding contained in UPS's declarations.

First, with respect to that component of swing driving work that involves substitution for absent drivers on assigned routes, the district court incorrectly assumed that the assigned routes using non-DOT vehicles were evenly distributed among UPS's five Phoenix "centers." In fact, the evidence before the district court established that the non-DOT routes are heavily concentrated in two of the centers (as one would expect, since the non-DOT routes are more prevalent in some geographical areas than in others). The declarations of UPS's Center Managers show that in the Glendale center, there is one swing driver for every five assigned routes, and that there are five assigned routes that use non-DOT vehicles. Similarly, in the East center, the ratio of swing drivers to assigned routes is 1:3.9, and there are four assigned routes that use non-DOT vehicles. The evidence tends to show that a swing driver operating only non-DOT vehicles would be occupied full time servicing the assigned routes using non-DOT vehicles out of those centers.

Second, the district court failed to consider another type of driving work performed by swing drivers. There was evidence before the district court that swing drivers are used by UPS to drive not only as substitutes on fixed routes, but also for overflow work, necessitated when the shipment volume for a given route is greater than normal. The proportion of overflow work handled using non-DOT vehicles is unclear from the record. Absent evidence showing that the amount of non-DOT swing driver work was insufficient to affect the availability of a full-time non DOT-certified swing driver position, Morton's evidence showing that overflow work is a component of the work performed by swing drivers would further support an inference that UPS could employ a swing driver limited to driving non-DOT vehicles.

Finally, there is also in the summary judgment record undisputed evidence that under the collective bargaining agreement swing drivers may displace part-time warehouse workers when there is insufficient driving work, and that swing drivers do routinely perform non-driving work. UPS does not contend that Morton could not perform the warehouse work or other tasks that swing drivers sometimes perform. Thus, the prospect that because Morton is not DOT-certified UPS may have to assign her occasionally to perform warehouse work cannot establish her inability to perform the essential functions of the swing driver job.

UPS contends that we may not address this last consideration because Morton did not specifically mention it below. Morton did, however, argue that she could perform the essential functions of the job she was seeking, with reasonable accommodation, and she included the evidence pertaining to this particular possible accommodation in the attachments to her summary judgment papers. More specific argument

concerning each conceivable accommodation was not necessary, in the circumstances of this case, to allow the plaintiff to explain to us on appeal what the record specifically before the district court on summary judgment indicates concerning the essential functions/ reasonable accommodation analysis.

Those circumstances, most notably, include the fact that UPS, by its own admission, did not participate with the plaintiff in the interactive process that the statute contemplates. *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1113–14 (9th Cir.2000) (en banc), *cert. granted,* —— U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001) (granting certiorari on an unrelated issue). *Barnett* holds that "employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Id.* at 1116; *see also id.* ("[S]ummary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith.") It is the employer's responsibility, through participation in the interactive process, to assist in identifying possible accommodations. *Id.* at 1115. Here, UPS does not argue that it *did* engage in good faith in the interactive process.[6] The question whether this failure should be excused because there would in any event have been no reasonable accommodation

available is one as to which the employer, not the employee, should bear the burden of persuasion throughout the litigation. *See id.* at 1115–16 ("[T]he jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.").[7]

For all these reasons, we conclude that on the present record, a reasonable juror could determine that driving DOT vehicles was not an essential function of the job of package car driver.

■ UPS argues, however, that even if Morton could perform the swing driver job's essential functions, accommodating her so she could do so would constitute an "undue hardship." Employers are required to make only "reasonable accommodations" that do not impose "undue hardships" on them. 42 U.S.C. § 12112(b)(5)(A) (2001); *see also Cripe,* 261 F.3d at 885 n. 6. The Act defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of" various factors. 42 U.S.C. § 12111(10)(A). These factors include the nature and cost of the accommodation, the size and resources of the covered entity, and the effect of the accommodation on the operations of the covered entity. 42 U.S.C. § 12111(10). Undue hardship analysis is thus a fact-intensive inquiry, rarely suitable for reso-

---

6. For that reason, and because the employer's ultimate liability under *Barnett* turns on the availability of a reasonable accommodation, we do not independently address the interactive process cause of action, but we do reverse the summary judgment as to that claim as well as the ones we do discuss.

7. *Barnett* can be read as holding that an employer who has not engaged in the interactive process is not entitled to summary judgment no matter what the evidence on summary judgment shows concerning the actual availability of a reasonable accommodation. It is

odd, however, to delay until trial an issue that is fact dependent, if proof of the relevant facts—here, the facts pertinent to proving that a relevant accommodation was available— *will* be necessary at trial. We therefore understand *Barnett* as holding, instead, that the task of proving the negative—that *no* reasonable accommodation was available—rests with an offending employer throughout the litigation, and that, given the difficulty of proving such a negative, it is not likely that an employer will be able to establish on summary judgment the absence of a disputed fact as to this question.

lution on summary judgment. *See Humphrey,* 239 F.3d at 1139. Further, and critically for present purposes, "[t]he ADA's reasonable accommodation requirement puts the burden on the employer to show that a proposed accommodation will cause undue hardship." *Barnett,* 228 F.3d at 1113; *see also* 42 U.S.C. § 12112(b)(5)(A) (An employer violates the ADA by "not making reasonable accommodations ... unless such *covered entity can demonstrate* that the accommodation would impose an undue hardship on the operation of the business of such covered entity.") (emphasis added).

Looked at in light of these considerations, the summary judgment record before us is clearly insufficient to warrant summary judgment for UPS on this closely related alternative ground. The degree of the "difficulty" of accommodating Morton—a central inquiry in an undue hardship analysis—is, as explicated above, very much disputed, and UPS presents essentially no concrete evidence regarding the "expense" of accommodating Morton, either absolutely or in light of its own "size and resources" (which are obviously both quite large). Thus, we may not affirm on this alternative ground.

### C. Business necessity

Finally, UPS asks us to affirm on another basis not addressed by the district court—that its use of the DOT certification requirements as a screening test for all drivers is permissible under the "business necessity" rule, because the DOT certification requirements effectively encompass safety requirements that UPS may, consistent with the ADA, impose on all drivers.

■ The ADA defines "discrimination" to include the use of:

> qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6). The statute goes on to state that:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and that such performance cannot be accomplished by reasonable accommodation, as required by this subchapter.

42 U.S.C. § 12113(a).[8] While an individualized assessment of the applicant's ability to perform the essential functions of the job is normally required by the ADA, *see, e.g., McGregor v. National R.R. Passenger Corp.,* 187 F.3d 1113, 1116 (9th Cir.1999),

---

**8.** These two provisions—as well as other parts of this statute, *see, e.g.,* 42 U.S.C. § 12112(d)(4)(A)—appear to be largely redundant, although their wording does differ somewhat. It would have been more orderly, to be sure, had the affirmative discrimination provision left out the truncated version of the defense that is then repeated, with elucidation, in the separate section directed at "Defenses." Despite the general principle against construing a statute so as to contain redundancies, *see Gutierrez v. Ada,* 528 U.S. 250, 258, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000), we cannot avoid the conclusion here that the two versions of the general business necessity defense are intended to encompass the same basic requirements. Absolutely no other explanation of the interaction of the two provisions comes to mind. We therefore use the language of both sections to determine the scope of the defense.

an employer may require disabled employees as well as others to meet an across-the-board qualification standard if it can establish the stringent elements of the business necessity defense. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 568, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Cripe,* 261 F.3d at 890.

■ 1. *Direct Threat Defense:* Morton contends that safety-related qualification standards may be applied to screen out a job applicant only where the applicant poses a threat to others in the workplace. In other words, she argues that *all* safety-related qualification standards must be defended not under the business necessity framework or any other, but under the ADA's "direct threat" provision, 42 U.S.C. § 12113(b), which reads:

> The term "qualification standards" may include a requirement that an individual shall not pose a threat to the health or safety of other individuals in the workplace.[9]

We disagree.

As the Supreme Court has noted, the position Morton espouses is that "taken by the EEOC in the Interpretive Guidance promulgated under its authority to issue regulations to carry out Title I of the ADA," *see* 29 C.F.R. pt. 1630, App., §§ 1630.15(b) and (c) (1998) (requiring safety-related standards to be evaluated under the ADA's direct threat standard). *Albertson's,* 527 U.S. at 569 n. 15, 119 S.Ct. 2162.[10] The Court in *Albertson's* questioned, in *dicta,* whether this construction, "which might impose a higher burden on employers to justify safety-related qualification standards than other job requirements," was a sensible reading of the Act. *See id.* The Fifth Circuit has since held that it is not. *E.E.O.C. v. Exxon,* 203 F.3d 871, 874–75 (5th Cir.2000). We agree with the Fifth Circuit's result, but for somewhat different reasons.

We note, first, that the direct threat defense is on its face of little applicability here, because it pertains only where the threat is to "other individuals in the workplace." We have indicated that "others in the workplace" under 42 U.S.C. § 12113 includes not only co-employees but also customers, at least where the customers are present in the workplace. *Nunes v. Wal–Mart Stores,* 164 F.3d 1243, 1248 (9th Cir.1999). Here, however, (and in *Exxon,* 203 F.3d at 872), the asserted threat went beyond those present in the workplace to the general public.

That the direct threat defense is so limited, moreover, is a substantial clue to its intended scope. As the Fifth Circuit recounted in *Exxon,* the legislative history of the provision—to which we may surely resort, given the near incoherence of the section read literally (to which we have already alluded), *see United States v. R.L.C.,* 503 U.S. 291, 298, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992)—indicates that it was intended to codify and expand upon the defense recognized by the Supreme

---

9. We note that this provision of the statute as well poses substantial interpretation challenges. The language of the subsection does not read as setting forth an independent affirmative defense, but that is apparently what Congress intended. *See Albertson's,* 527 U.S. at 569–70, 119 S.Ct. 2162.

10. Although the EEOC has been delegated responsibility by Congress with regard to Title I of the ADA, *see* 42 U.S.C. § 12116, we need not decide the level of deference due to the EEOC's Interpretive Guidance. As we will explain, the EEOC's interpretation cannot be squared with the plain, limited language of the direct threat defense. The intent of Congress is therefore clear, so we would reject the EEOC's interpretation of the statutory direct threat defense even if we were to find that deference under *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is appropriate.

Court in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). *Exxon*, 203 F.3d at 874–75; *see also E.E.O.C. v. United Parcel Serv., Inc.* ("*UPS*"), 149 F.Supp.2d 1115, 1164 (N.D.Cal.2000). *Arline* involved an employee with a contagious disease; the legislative history alludes as well to individuals with mental disabilities and mental illnesses. *See* H.R.Rep. No. 101–485, pt. 3, at 45–46 & n.37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 468–69 & n.37.

At the same time, the defense as articulated does not allude to any kind of job-relatedness; in that respect, it differs profoundly in its scope from both the business necessity defense in the ADA, and from the bona fide occupational qualification defense contained in several other employment discrimination statutes. *See, e.g., W. Air Lines v. Criswell*, 472 U.S. 400, 411–17, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) (bona fide occupational qualification ("bfoq") defense under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(f)(1)); *Autoworkers v. Johnson Controls*, 499 U.S. 187, 200–203, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (same under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(e)(1)). Combined with the focus on danger to other individuals in the workplace, the absence of any job-related requirement suggests that the direct threat defense was meant as a very narrow permission to employers to exclude individuals with disabilities *not* for reasons related to their performance of their jobs, but because their mere presence could endanger others with whom they work and whom they serve. *Compare Johnson Controls*, 499 U.S. at 203–204, 111 S.Ct. 1196 (bfoq "exception is limited to instances in which sex . . . actually interferes with the employee's ability to perform the job," and so does not extend to risk of injuries to third parties who are neither customers nor third parties whose safety is essential to the business).

■ This approach to determining the scope of the direct threat defense makes more sense to us in the context of the statute as a whole than the Fifth Circuit's analysis. The Fifth Circuit in *Exxon* viewed the direct threat provision as addressing cases in which an employer responds to the supposed risk created by an individual employee's presence in the workplace, where that risk is not addressed by an existing qualification standard. Under that view, the provision does not apply to a qualification standard applicable to all employees in a given classification; such a qualification standard is properly analyzed under the ordinary business necessity framework. *See* 203 F.3d at 875.

We doubt, however, that Congress intended the *Arline* situation to come out differently under the ADA depending upon whether the employer in question had a preannounced, across-the-board policy excluding employees with latent communicable diseases from the workplace, or not. Nor could an employer, in all likelihood, make out a business necessity defense on the facts of *Arline*, as the exclusion of employees with contagious diseases is unlikely to be considered "job-related." Rather, whatever the scope or timing of the employer's policy or decision, where the only danger was to co-workers or others present at the workplace, and where the danger was not one that involved actual job performance, the narrower direct threat defense would apply.

In this case, not only is the alleged danger upon which UPS relies to the public in general, but UPS's concerns about safe driving do centrally involve the performance of the driving job to which Morton aspires. *See UPS*, 149 F.Supp.2d at 1159 n. 3 ("Here, driving without accidents *is* like flying without crashing."). We conclude that the direct threat defense has no application to this case.

■ 2. *Business Necessity Defense:* That conclusion, however, does not necessarily dictate that the business necessity defense does apply, and if it does, how.

The business necessity/job relatedness concept first developed in the Title VII context, in *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). *Griggs* held that where facially neutral qualification standards had a disparate negative impact on members of a protected class, the employer was liable under Title VII unless it could show that the standard was a job-related "business necessity." 401 U.S. at 431, 91 S.Ct. 849. To meet its burden, the employer had to demonstrate a "significant correlation" between the qualification and important aspects of the job in question. *Id.* at 434, 91 S.Ct. 849. Even if the employer establishes job-relatedness, a plaintiff may still show that a less discriminatory alternative test would serve the employer's interest, and thereby defeat the attempt to invoke the defense. *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. 2362; *see also* 42 U.S.C. § 2000e-2(k) (1991 amendment to Title VII codifying the business necessity defense). Given that background, it is reasonable to assume that Congress intended the business necessity defense in the ADA to parallel, to the degree the language and structure of the statutes is similar, the previously-developed defense under the earlier-enacted statutes. *See Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112, 1123 (9th Cir.2001) (citing *Northcross v. Bd. of Educ. of Memphis City Schs.,* 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), for the proposition that "similarity of statutory language is strong indication that statutes should be interpreted in the same manner").

We cannot ignore, however, that there are distinctions of some note between the business necessity defense in the ADA and the parallel defense in Title VII, distinctions that, we conclude, indicate that the ADA business necessity defense may not mimic in all respects the defense as it has been developed in the earlier statute.

For one thing, under Title VII, the business necessity defense applies only where a facially neutral qualification standard disadvantages a protected group. Where, instead, there is disparate treatment based directly on a proscribed classification, only the more stringent bfoq defense is available.[11] *Johnson Controls,* 499 U.S. at 198, 111 S.Ct. 1196. It is the bfoq defense that has ordinarily been invoked when job-related safety requirements distinguishing among members of protected classes are at stake. *See, e.g., Criswell,* 472 U.S. at 419–420, 105 S.Ct. 2743. Applying even that stringent defense, courts have recognized that *safe* transportation—safe for both passengers, if any, and the general public—*is* "reasonably necessary" for transportation companies "to further the overriding interest in public safety," if the employer can show either (1) that "all or substantially all" individuals who cannot meet the employer's qualification cannot perform the job safely; or (2) it is either impossible or highly impractical to determine which employees who lack the qualification may be able to perform safely. *Criswell,* 472 U.S. at 413–14, 105 S.Ct. 2743.

It does not appear, however, that the ADA business necessity defense is also limited to qualification standards that do not focus directly on the protected class,

---

**11.** Under Title VII, the bfoq defense is not available at all where discrimination is based on race or color.

here, disabled individuals. The ADA defines "discriminate" to include not only employment practices that result from disparate treatment or create a disparate impact, *see* 42 U.S.C. §§ 12112(a) and (b)(1),(3), and (6), but also a failure to make reasonable accommodations in accord with statutory requirements. *See* 42 U.S.C. § 12112(b)(5) and (7). The business necessity defense, in turn, applies not only where qualification standards "screen out or tend to screen out" individuals with disabilities—language that could well be read as pertaining not only to neutral criteria with a disparate impact [12]—but also to qualification standards that "otherwise deny a job or benefit to an individual with a disability." 42 U.S.C. § 12113(a). It thus appears that a business necessity defense is available where the employer's qualification standard requires a physical or mental capacity that, by definition, a person with a certain kind of disability cannot demonstrate—here, passing a hearing test at a certain level.

We have previously so assumed under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–961. *See Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 621–22 (9th Cir.1982) (applying a business necessity analysis to claim of risk posed by diabetic condition of an employee); *cf.* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights [applicable to ADA claims]."). The seminal case under the Rehabilitation Act regarding the business necessity defense, *Prewitt v. United States Postal Serv.*, 662 F.2d 292 (5th Cir.1981),

cited approvingly in the pertinent ADA legislative history, *see* H.R.Rep. No. 101–485, pt. 3, at 42 n.32, *reprinted in* 1990 U.S.C.C.A.N. 445, 465 n.32, did portray the defense as limited to disparate impact situations. 662 F.2d at 307–08. *Prewitt*, however, considered determinations based directly upon the employee's physical condition as raising only disparate impact concerns. *See id.* at 306–09. So *Prewitt* supports the conclusion that Congress intended to provide for a business necessity defense with regard to qualifications standards that focus directly on an individual's disabling or potentially disabling condition.

At the same time, three other provisions of the ADA suggest that Congress must have intended to permit across-the-board exclusion of employees based upon disability-related safety criterion only on a showing somewhat similar to the one used for safety qualifications under the Title VII and the ADEA bfoq standard.[13]

*First*, although there is no bfoq defense as such in the ADA, there *is* a threshold requirement that a covered employee or prospective employee must be a "*qualified* individual with a disability"—that is, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8) (emphasis supplied); *see also* 42 U.S.C. § 12112(a). That language to some degree expresses concepts similar to those reflected in the bfoq defense as it pertains to safety concerns. *See Criswell*, 472 U.S. at 413, 105 S.Ct. 2743 (To be permissible, safety qualifications must be "*reasonably necessary* to the *essence* of

---

12. It would be strange, for example, to refer to an employment criterion that entirely and directly precludes the hiring of women as one that "screens out or tends to screen out" women. *See Griggs*, 401 U.S. at 428 n. 3, 91 S.Ct. 849 (using the phrase "screen out" to connote a neutral standard with a disparate impact).

13. It may, however, be somewhat easier for an employer to make out a safety-related defense under the ADA than under Title VII or the ADEA, as actual physical impairments may correlate more readily with safety risks than surrogates for such impairments, such as age.

the business.") (second emphasis added). The job-relatedness feature of the ADA business necessity defense, then, must pertain only to *essential* functions of the job, so as to mesh with the statute's affirmative provisions. The House Committee Report on the bill that became the ADA reflects precisely this understanding. *See* H.R.Rep. No. 101–485, pt. 3, at 32, *reprinted in* 1990 U.S.C.C.A.N. 445, 454–55 ("If a person with a disability applies for a job and meets all selection criteria except one that he or she cannot meet because of a disability, the criterion must concern an essential, and not marginal, aspect of the job ... [and] be carefully tailored to measure the actual ability of a person to perform an essential function of the job.").

*Second,* the ADA also contains another affirmative employer defense, for "undue hardship," that can involve assertions of employer interests similar to those encompassed by the business necessity defense. The undue burden defense, however, concerns not across-the-board qualification standards but a particularized inquiry— "whether it is too onerous for a particular employer to make a specific accommodation sought by a specific employee." *Cripe,* 261 F.3d at 890. We held in *Cripe* that the ADA business necessity defense must necessarily be quite stringent, because the undue burden defense is itself "strict," and "[t]o excuse a generally discriminatory provision, which is what the business necessity defense does, certainly requires more of a showing than is needed to excuse an employer from accommodat-

ing a specific employee under the undue hardship standard." *Id.* An employer attempting through the business necessity defense "to excuse a generally discriminatory provision" therefore must make a convincing showing both in demonstrating the correlation between the qualification standard and safe job performance and in proving the difficulty of using less restrictive alternatives. In light of the layers of ADA defenses and the "necessity" and "job-related" criteria contained in the ADA business necessity provision, it is hard to see why this showing should differ significantly from the "reasonably necessary to the essence of the business" requirement as applied under the Title VII and ADEA bfoq provisions.

■ *Finally,* the ADA business necessity defense contains an additional requirement that is specific to the ADA: To validly exclude an employee from employment or the benefits thereof, a qualification standard not only must be "job-related and consistent with business necessity," but also must be incapable of modification through a reasonable accommodation that would permit a disabled employee to meet the standard.[14] The precise scope of this corollary is open to some dispute. *See UPS,* 149 F.Supp.2d at 1163–64 (holding that the reasonable accommodation aspect of the business necessity defense does not require "individual assessment of the ability of each applicant to perform the essential job functions," but only individual accommodation with regard to meeting the qualification standard);[15] *id.* at 1164 n. 8

---

14. Yet again, the actual language of the statute in this regard is confusing: The reasonable accommodation provision refers to "such performance," but nothing in the remainder of § 12113(a) refers to any "performance" (although one does speak of "performing" on a test, and tests are *among* the kinds of requirements that may be permissible under the defense).

15. So, for example, if a job required a certain level of mathematical skill, tested by a pre-hire examination, an employee who, because of a disability, could not write could not be denied the position if the test could be given orally. If this were the meaning of the reasonable accommodation caveat, it would not be relevant here, as it is undisputed that Morton cannot satisfy the DOT hearing requirement with or without accommodations.

(recognizing that there is one passage in the legislative history indicating that under the ADA, otherwise valid across-the-board qualification standards are subject to an individualized assessment of ability to do the job). We do not resolve that significant issue here; it has not been briefed, and we ultimately conclude that UPS has not met its business necessity burden on summary judgment, however one understands the reasonable accommodation aspect of the ADA business necessity defense. We do note that, however construed, this aspect of the ADA business necessity defense demonstrates that Congress intended to permit employer insistence upon across-the-board qualification standards only if those standards "provide an accurate measure of an applicant's actual ability to perform the job...." H.R.Rep. No. 101–485, pt. 3, at 42, *reprinted in* 1990 U.S.C.C.A.N. 445, 465. If a transportation employer can demonstrate neither that all persons who fail to meet a disability-related safety criterion present an unacceptable risk of danger nor that it is highly impractical more discretely to determine which disabled employees present such an unacceptable risk—the Title VII/ADEA bfoq safety standard requirements—we would not think that the safety criterion would provide an accurate measure of actual ability.

In the end, then, the traditional understanding that the bfoq defense is more stringent than the Title VII business necessity standard should be of little relevance in assessing the validity of safety standards under the ADA business necessity defense. Essentially the same considerations—the nature of the risk, the adequacy of the connection shown between the employer's qualification standard and alleviation of the risk, and the showing of the *necessity* of across-the-board rather than individualized determinations—are likely to be relevant in both instances, and to the same extent. We therefore draw on both articulations—the traditional, general business necessity standard, and the more tailored bfoq safety standard—in determining whether UPS has on this summary judgment record met its burden regarding the validity of its rule precluding all employees who fail the DOT's hearing standard from driving trucks *not* regulated by DOT.

■■■ 3. *Application to this Case:* On this summary judgment record, UPS has not met its burden of showing that there is no triable issue as to job-relatedness or business necessity such that the company is entitled to judgment as a matter of law. We caution at the outset that we are in no way suggesting that the burden may not be met at trial. Nor are we requiring that UPS employ deaf drivers of non-DOT vehicles if it can show either that substantially all of them present a higher risk of accidents than non-deaf drivers or that there are no practical criteria for determining which deaf drivers present a heightened risk and which do not.

UPS conceded below, however, that it had never itself undertaken *any* independent study or determination of the appropriateness of applying the DOT hearing standard to non-DOT vehicles. That is understandable, as UPS's principal defense in this case has been that it is entitled to require all drivers, for practical rather than safety reasons, to be DOT eligible. UPS therefore seeks principally to rely upon DOT's hearing standard for trucks weighing over 10,000 pounds, maintaining that it should not be required independently to establish the need for such a requirement for smaller trucks.

Initially, UPS argues that it may simply apply the DOT-certification standards more broadly than it is required to by law, citing *Albertson's*, 527 U.S. at 577–78, 119 S.Ct. 2162. *Albertson's*, however, does not stand for such a broad proposition. Rath-

er, *Albertson's* held only that an employer need not justify its application of the DOT qualification standard as enacted (that is, to drivers of DOT vehicles), despite the existence of an experimental program in which the DOT vision standard could be waived in individual cases. The Court in *Albertson's* emphasized that the employer sought only to apply an "otherwise clearly applicable, unamended substantive regulatory standard despite the Government's willingness to waive it experimentally," *id.* at 577, 119 S.Ct. 2162, and indeed emphasized "that Albertson's here was not insisting upon a job qualification merely of its own devising." *Id.* at 570, 119 S.Ct. 2162. This rationale does not apply to the application of government safety standards *beyond* their intended scope, to drivers and vehicles that DOT has expressly chosen not to regulate. *See Trans World Airlines v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (TWA could not establish a bfoq with regard to age requirements for flight engineers simply by relying on the validity of such FAA-imposed requirements for pilots).

So the existence of the—by its own terms inapplicable—DOT standard cannot shoulder UPS's statutory burden. Instead, to establish its entitlement to the business necessity defense, UPS must show that its standard, *"as used by the covered entity*, is ... job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6) (emphasis added).

There is limited and conflicting evidence in the record, again derived in the main from DOT materials, regarding (i) whether deaf drivers like Morton are statistically less safe than other drivers that UPS employs, and (ii) whether non-DOT vehicles pose a sufficient safety threat to warrant application of the DOT standards to them.

On the first point, UPS offered the declaration of Kenneth Pierson,[16] who identified two studies showing that deaf *male* drivers of passenger cars were involved in approximately 1.8 times as many accidents as non-deaf drivers. A study limited to male drivers may not extrapolate to drivers generally, and, indeed, the same studies "found no difference in accident records for [deaf] female drivers." While both Pierson and the authors of one study offered speculation as to why this finding might not constitute scientifically valid evidence that female deaf drivers are actually as safe as non-deaf drivers (such as that the sample of female drivers was too small to draw firm conclusions, and that female drivers may drive less than male drivers), this speculation is not evidence. Put another way, what evidence there is in the record negates any conclusion that all or substantially all deaf drivers present a heightened risk of accidents; as the record now stands, it appears that only some of them do.

On the second point, there is evidence in the record regarding a DOT finding that non-DOT commercial vehicles "generally pose no greater safety risk than other vehicles of similar or lesser weight." *See* 53 Fed.Reg. 18,042 (1988). We note in passing that DOT's statement was in response to a comment by UPS on a proposed rule. UPS's comment (which DOT rejected) suggested that DOT should regulate commercial vehicles with gross vehicle weights below 10,001 pounds. UPS has

---

**16.** Morton has filed a motion to strike portions of this declaration pertaining to knowledge that Pierson claims to have regarding why DOT declined to regulate vehicles having a gross vehicle weight of 10,000 pounds or less. Because that portion of Pierson's declaration does not affect our decision, we need not address this motion at this point, but we vacate the district court's denial of the motion as moot so that the district court may reconsider the motion on remand.

submitted evidence suggesting that non-DOT vehicles are as or nearly as dangerous as DOT vehicles, in the form of the Pierson declaration's discussion of various scientific studies. This evidence raises a triable issue as to whether the safety considerations underlying the physical requirements for drivers of DOT vehicles are applicable to non-DOT vehicles as well, but it does not bolster the thin record sufficiently to meet UPS's summary judgment burden.

Moreover, the present record in no way addresses the question whether it would be possible to determine which deaf drivers present a higher risk of accidents and which—if any—do not. Some obvious considerations affecting the level of risk suggest themselves, including the drivers' personal driving record, the precise nature of the hearing loss (Morton, for example, says that she can hear car horns), and whether they have had or could have in the future special training concerning particular safety precautions that can mitigate loss of hearing as a driving risk. Further, in considering whether the ban on deaf drivers of non-DOT trucks is "reasonably necessary" to UPS's business (or correlated with an essential function of the driver's job, driving safely), the level of risk that UPS accepts for drivers generally and for ascertainable subgroups of drivers is pertinent. *Cf. Johnson Controls*, 499 U.S. at 220, 111 S.Ct. 1196 (White, J., concurring in part and concurring in the judgment) (necessary in bfoq analysis to "consider the level of risk avoidance that was part of [the employer's] 'normal operation' ").

In sum, the record does not permit judgment as a matter of law for UPS on its business necessity defense. If UPS were able to show that empirical evidence in this area is so difficult to come by that it is impossible to identify specific risk factors and then use those factors to sort disabled applicants into risk categories, then its

application of an overinclusive qualification standard might meet the business necessity test, by virtue of UPS's undeniable interest in hiring safe drivers. And we reiterate that it may well be that the reason for the paucity of the evidence in the record is UPS's choice of litigation strategies, not that UPS's concerns about heightened accident risks for non-DOT drivers when the drivers cannot hear are insubstantial or unprovable. But on this summary judgment record, we are unable to conclude that the application of the DOT requirements beyond their intended scope serves important job-related functions, or that no less discriminatory alternative could serve UPS's interests. We therefore decline to affirm on this alternative ground, and instead remand to the district court so that it may address these factual questions in the first instance, after opportunity for further factual development. *See Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1182–83 (9th Cir.1999).

## III. Conclusion

The district court erred in holding that the collective bargaining agreement barred Morton's requested accommodation. The court also erred in granting summary judgment to UPS in the face of conflicting evidence as to the logistical and safety-related reasons UPS offered for not hiring Morton.

REVERSED and REMANDED.