# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC BATES; BERT ENOS;
BABARANTI OLOYEDE; ERIC
BUMBALA; EDWARD WILLIAMS, on
behalf of themselves and all others
similarly situated,
          *Plaintiffs-Appellees,*

v.

UNITED PARCEL SERVICE, INC., dba
UPS,
          *Defendant-Appellant.*

No. 04-17295

D.C. No.
CV-99-02216-THE

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

Argued and Submitted
September 15, 2005—San Francisco, California

Filed October 10, 2006

Before: Betty B. Fletcher, John R. Gibson,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

*The Honorable John R. Gibson, Senior United States Circuit Judge for
the Eighth Circuit, sitting by designation.

17473

**COUNSEL**

Christopher J. Martin and Rachel S. Brass, Gibson, Dunn & Crutcher LLP, Palo Alto, California, Mark A. Perry and Rachel A. Clark, Gibson, Dunn & Crutcher LLP, Washington, D.C., for the defendant-appellant.

Laurence W. Paradis and Caroline A. Jacobs, Disability Rights Advocates, Oakland, California, Todd M. Schneider and W.H. Willson, Schneider & Wallace, San Francisco, California, for the plaintiffs-appellees.

Claudia Center and Lewis Bossing, The Legal Aid Society — Employment Law Center, San Francisco, California, for amici curiae American Association of People with Disabilities et al.

Ann Elizabeth Reesman, McGuiness Norris & Williams, LLP, Washington, D.C., for amicus curiae Equal Employment Advisory Council.

Barbara L. Sloan, Equal Employment Opportunity Commission, Washington, D.C., for amicus curiae Equal Employment Opportunity Commission.

## OPINION

BERZON, Circuit Judge:

This case concerns whether United Parcel Service (UPS) may categorically exclude individuals from employment positions as "package-car drivers" because they cannot pass a United States Department of Transportation (DOT) hearing standard that does not apply to the vehicles in question. A class of UPS employees and applicants unable to pass the DOT hearing standard — a class we refer to throughout this opinion as "Bates" (the last name of the original class's lead plaintiff) — contends that this policy violates the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and two California laws: (1) the Fair Employment and Housing Act (FEHA), CAL. GOV'T CODE §§ 12900-12996; and (2) the Unruh Civil Rights Act (Unruh Act), CAL. CIV. CODE § 51.

After the first phase of a bifurcated trial, the district court held in a detailed opinion that UPS violated the ADA, the FEHA, and the Unruh Act, and ordered injunctive relief.[1] At

---

[1]The district court decision briefly mentions California Government Code Section 12920, which is part of the FEHA and provides, in pertinent part, that "[i]t is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical disability." The district court decision noted that "a violation of Plaintiffs' rights under federal and state

the same time, the district court denied UPS's motion for judgment on partial findings or, in the alternative, for class decertification. On appeal, UPS contends that (1) Bates did not establish that any class members are "qualified"; (2) UPS satisfied its burden under the business necessity defense of the ADA; (3) the plaintiff class should be decertified; (4) the court's injunction was an abuse of discretion; and (5) UPS did not violate the FEHA or the Unruh Act.

Much of the basic legal ground covered in this appeal was covered in *Morton v. United Parcel Service, Inc.*, 272 F.3d 1249 (9th Cir. 2001), a case in which another deaf UPS employee challenged the company's use of the DOT hearing standard for smaller vehicles to which the standard does not apply. Because, unlike this case, *Morton* came to us on summary judgment, we did not resolve the validity of UPS's use of the DOT hearing standard. We did, however, spell out some of the applicable legal principles, including burdens of proof, for deciding the question on a completely developed record. There is such a record here. On that record, we affirm the district court's factual findings as not clearly erroneous and its holding that UPS violated the ADA as consistent with the applicable legal standards. We also affirm the district court's denial of UPS's motion to decertify the class and the terms of the injunction issued. Because the district court's injunction can be upheld on ADA grounds alone and because the pertinent FEHA law has changed since the district court's decision, we do not at this time review the FEHA claim. Finally, we reverse the district court's finding that UPS vio-

anti-discrimination statutes would clearly violate the public policy of protecting such rights."

It appears that the district court relied on Section 12920 only for public policy informing its interpretation of FEHA, not as the basis for a separate cause of action. We therefore do not consider whether Section 12920 could be the basis for a separate cause of action either under the FEHA or in tort.

lated the Unruh Act, as a recent decision by this court requires us to do so.

## I.  Background

UPS package-car drivers deliver and pick up packages for UPS in the familiar brown UPS trucks. An individual who wishes to become a UPS package-car driver must be an employee of UPS in a qualifying position and must "bid" on a package-car driving position. When an opening for a driving position becomes available at a particular UPS center, UPS contacts the individual in that UPS center with the highest seniority who has bid on such a position.[2] If that person is not interested, the human resources department moves down the list of individuals who have bid on a position in seniority order until it finds an employee interested in the position. Once UPS has located such an employee, that individual must demonstrate that she satisfies several requirements. The requirements vary somewhat from district to district but generally include (1) having completed an application; (2) being at least twenty-one years of age; (3) possessing a valid driver's license; (4) having a "clean driving record"; (5) passing a UPS road test; and (6) passing the physical exam the DOT requires drivers of commercial vehicles to pass. Standards for the "clean driving record" requirement vary, but a common one is that a driver not have more than three moving violations or any convictions for driving while intoxicated within the previous three years. If an applicant demonstrates that she satisfies all of these requirements, she proceeds to driver training, after which she begins a probationary period. Upon successful completion of the probationary period, she becomes a package-car driver.

At issue in the present appeal is the hearing standard that

---

[2]UPS is divided into sixty-one districts, each of which includes various package delivery "centers" covering different geographical areas.

is part of the DOT physical. An individual satisfies the DOT hearing standard if she

> [f]irst perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5-1951.

49 C.F.R. § 391.41(b)(11). According to the district court, the forced-whispered standard requires that potential drivers not only hear the sounds made but understand the words spoken.

Although UPS requires drivers of all package cars to pass the DOT physical, the DOT does not so mandate. Instead, the DOT requires it only for those driving vehicles with a "gross vehicle weight" or "gross vehicle weight rating" (GVWR) of at least 10,001 pounds. *See* 49 U.S.C. § 31132(1)(A); 49 C.F.R. § 391.41. A vehicle's "gross vehicle weight" is the actual weight of the vehicle plus any cargo in the vehicle. A vehicle's GVWR is determined by the manufacturer and is equal to the sum of the weight of the vehicle and the maximum load the manufacturer believes the vehicle can carry. As of October 2003, UPS's fleet contained 5902 vehicles with a GVWR of less than 10,001 pounds. The GVWR of those vehicles ranged from 7160 pounds to 9318 pounds.

The class accepts, as it must, that UPS may lawfully exclude individuals who fail the DOT test from positions that would require them to drive DOT-regulated vehicles. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999). Bates contends, however, that UPS may not lawfully exclude deaf individuals from consideration for positions that require

them to drive only vehicles whose gross vehicle weight and GVWR are less than 10,001 pounds.

The district court found that Bates satisfied his prima facie case based upon a combination of two factors: *first*, UPS's blanket exclusion of deaf individuals, and *second*, the credentials of at least one named plaintiff, Babaranti Oloyede, and at least one class member, Elias Habib, who were "qualified" by virtue of having satisfied all prerequisites for the driving position other than those connected to the DOT standard. The court further concluded that Bates did not have the burden to establish at this stage that any plaintiffs were "qualified" in the sense that they are capable of driving safely. Accordingly, the district court denied UPS's motion to decertify the class, rejecting UPS's argument that the class lacked a representative qualified for the driving positions in question.[3]

The district court next found that UPS failed to satisfy its burden under the business necessity defense and that the policy, therefore, violates the ADA (and, accordingly, the FEHA and the Unruh Act as well. Based on these conclusions, the district court issued an injunction prohibiting UPS from categorically excluding individuals who fail the DOT standard from consideration for positions driving non-DOT-regulated vehicles.

## II.    Jurisdiction

UPS appeals pursuant to 28 U.S.C. § 1292(a)(1), which grants us jurisdiction over "[i]nterlocutory orders of the district courts . . . granting . . . injunctions . . . , except where a direct review may be had in the Supreme Court." UPS's appeal of the district court's order granting a permanent injunction falls squarely within the scope of § 1292(a)(1). We

---

[3]The district court's findings of fact on this and other matters are reviewed in greater detail later, as they become pertinent.

therefore have jurisdiction under § 1292(a)(1) to review the district court's injunctive order.

Section 1292(a)(1) also grants us jurisdiction to review the legal and factual decisions made by the district court that underlie its injunctive order where — as here — those issues "are inextricably bound up with the injunction." *See Idaho Watershed Project v. Hahn*, 307 F.3d 815, 824 (9th Cir. 2002); *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 680 (9th Cir. 1990); *Marathon Oil Co. v. United States*, 807 F.2d 759, 764 (9th Cir. 1986). Such review is particularly appropriate in cases like the present one, in which the appeal is taken from a permanent, rather than pre-liminary, injunction and "[t]he district court has completed its consideration of the liability issue, retaining jurisdiction only for an accounting of damages." *See Marathon*, 807 F.2d at 764. Because the district court's legal authority to grant the injunction stemmed from its holding that UPS violated the ADA and the California laws, those holdings are "inextricably bound up" with its injunction. We therefore have jurisdiction to review the district court's liability determinations under § 1292(a)(1).

Similarly, § 1292(a)(1) provides us with jurisdiction to review the denial of UPS's motion on partial findings as well the denial of its motion for class decertification; like the lia-bility determinations, these motions, too, are "inextricably bound up" with the injunction.[4] *See Paige v. California*, 102 F.3d 1035, 1039-40 (9th Cir. 1996) (holding that when a class certification order and an injunction granting class-wide relief are appealed, courts have jurisdiction under § 1292(a)(1) over

---

[4]Bates contends that we lack jurisdiction over the district court's denial of the motion for judgment on partial findings because UPS did not seek certification of the issue pursuant to 28 U.S.C. § 1292(b), but his argument is mistaken. When we have jurisdiction pursuant to § 1292(a), litigants need not also meet the requirements of § 1292(b). *See Armstrong v. Wil-son*, 124 F.3d 1019, 1021 (9th Cir. 1997); *TransWorld Airlines*, 913 F.2d at 680.

the class certification order because it is "inextricably bound up" with the injunction); *Immigrant Assistance Project of L.A. County Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 869 (9th Cir. 2002).[5]

## III.   "Qualified" Inquiry

UPS argues that, to establish a "prima facie case," Bates must satisfy all job prerequisites other than the challenged DOT standard and prerequisites related to that standard (such as completing UPS's driving test and driving training), and must also demonstrate an ability to drive "safely." This argument is based on the ADA's definition of a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See, e.g.*, *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) ("A plaintiff bears the burden of demonstrating that she can perform the essential functions of her job with or without reasonable accommodation."). The district court rejected this argument, and so do we.

---

[5]We reject Bates' argument that we may not review the denial of the class decertification motion, *Paige* and *Immigrant Assistance Project* notwithstanding, because UPS did not petition for permission to appeal that decision within the ten-day deadline imposed by Federal Rule of Civil Procedure 23(f) for review of class certification decisions not otherwise appealable. (UPS did apply to us for permission to appeal the *original* class certification order pursuant to Rule 23(f), but we denied the application.) Nothing within the language of the Rule 23(f), its authorizing statute (28 U.S.C. § 1292(e)), or its history indicates that it is meant to provide the exclusive route to obtaining appellate review or to impose time limits on interlocutory appeals proper under other statutory provisions. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (internal quotation marks omitted) (surveying the purposes of Rule 23(f)); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 833-35 (7th Cir. 1999) (surveying the history of Rule 23(f) and observing that it was meant to expand appellate jurisdiction).

Initially, we note that we do not agree with the district court's conclusion that *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), is pertinent to this case. Unlike cases involving individual or pattern-and-practice disparate treatment, *see, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-03 (1973) (individual disparate-treatment case); *Int'l Bhd. of Teamsters*, 431 U.S. at 334-36 (pattern-or-practice disparate-treatment case), this case involves an employer's *facially discriminatory* policy. As a result, a burden-shifting protocol is unnecessary. The fact to be uncovered by such protocols — whether the employer discriminated on a proscribed basis — already has been admitted. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182-83 (6th Cir. 1996) (noting that when a defendant admits to taking account of disability status, the *McDonnell Douglas* burden-shifting framework is unnecessary).[6]

For reasons developed below, however, we agree with UPS that, to maintain this suit, Bates must establish that at least one named plaintiff is "qualified" in the sense that the named plaintiff satisfied all prerequisites other than those connected to the DOT standard. Such a showing is necessary to establish the class's statutory standing to bring a lawsuit under the ADA. *See Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996) (similarly recharacterizing as a standing contention a defendant's contention that a plaintiff in a disparate impact Title VII case did not establish she was "qualified" as part of her prima facie case). But, we do not agree with UPS that Bates also bears the burden of establishing that at least one class member is "qualified" in the sense that he can drive "safely." We reject that contention as structurally incompati-

---

[6]Moreover, whether a plaintiff established a prima facie case in the employment discrimination burden-shifting sense is moot after trial. At that point, the relevant inquiry is simply whether the evidence presented at trial supports a finding of a violation. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003).

ble with the statute's affirmative business necessity defense, as will appear.

## A.    Prerequisites

**[1]** The question of whether there is a named plaintiff who may maintain this suit turns, in the first instance, on whether there is such an individual who has statutory standing to pursue this litigation. Title I of the ADA states that "any person alleging discrimination on the basis of disability in violation of any provision of this chapter" shall have the "powers, remedies, and procedures set forth" in, inter alia, 42 U.S.C. § 2000e-5, which applies to Title VII employment discrimination claims. 42 U.S.C. § 12117(a). Section 2000e-5, in turn, provides that any "person claiming to be aggrieved" may bring suit. § 2000e-5(f)(1). The Sixth Circuit has stated that "such broad language in the enforcement provision" of the ADA "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002)) (internal quotation marks omitted) (considering Title II of the ADA and the Rehabilitation Act, the former of which uses the "person alleging discrimination" language in its enforcement provision and the latter of which uses the "person aggrieved" language in its enforcement provision). We agree with the Sixth Circuit that to establish standing in this case under the ADA, Bates need only establish the same prerequisites needed for Article III standing.[7] *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (holding that a plaintiff must fulfill three

---

[7]We do not decide whether prudential concerns limit third-party standing under the ADA, as that issue is not before us. Bates alleges that class members, not third parties, were the victims of the discrimination at issue. *See Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 186 (2d Cir. 2001) (declining to decide the same issue in a Title VII case for similar reasons); *Patee v. Pac. Nw. Bell Tel.*, 803 F.2d 476, 478 (9th Cir. 1986) (holding that prudential concerns limit standing in Title VII cases).

requirements — injury in fact, causation, and redressability — to establish Article III standing).

**[2]** When the plaintiff is a class, the class must establish that at least one named plaintiff has standing in order for the entire class to have standing. *See Casey v. Lewis*, 4 F.3d 1516, 1519, 1524 (9th Cir. 1993). Our question, therefore, is whether Oloyede meets the statutory standing requirement.[8] Our inquiry is limited to the first prong of analysis[9] — namely, whether Oloyede suffered an injury because of the categorical bar posed by the DOT hearing standard that is sufficiently "concrete and particularized" and "actual or imminent" to satisfy the "injury in fact" requirement. *See Lujan*, 504 U.S. at 560-61.

Determining whether Oloyede was "injured" requires examining whether Oloyede was "qualified" for the driving position he desired in the sense that, aside from the DOT standard he is challenging and all prerequisites connected to that standard, he meets the basic job requirements for the desired position. In *Melendez*, the Seventh Circuit held that, to establish standing to bring a Title VII disparate impact case, a plaintiff show she is "qualified" in this same sense, reasoning:

> Absent direct evidence showing that a plaintiff was not hired . . . because of a discriminatory employment practice, we assume that an unqualified plaintiff was not hired or promoted for the obvious reason — that he was unqualified. Such a plaintiff would

---

[8]Because we affirm the district court's findings of fact with respect to Oloyede, we do not consider the district court's findings with respect to Habib.

[9]The second and third elements of the standing test are not at issue. If Oloyede suffered injury, there was a causal connection between that injury and UPS's policy, and the injury is redressable at least by appropriate prospective relief. Whether retrospective damages will be available is a question not yet decided by the district court, so we do not address the question.

have no standing to sue . . . , for he could not claim that he was injured, much less affected, by defendant's use of an employment practice with an allegedly disparate impact.

79 F.3d at 668; *see also Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) (holding the same). Similarly, absent evidence that a plaintiff challenging a facially discriminatory qualification standard in an ADA case fulfilled those prerequisites for the position not connected to the challenged qualification standard, the plaintiff could not claim he was aggrieved by the challenged qualification standard. *Cf. Long v. Coast Resorts, Inc.*, 267 F.3d 918, 924 (9th Cir. 2001) (holding that plaintiffs did not have standing as "person[s] aggrieved" to challenge alleged ADA violations affecting only employees of a casino because plaintiffs were not themselves employees); *Casey*, 4 F.3d at 1524 (holding that a class of prison inmates failed to establish that any named plaintiff suffered actual injury from a prison policy prohibiting HIV-positive individuals from obtaining employment in its food-service department because the class did not show that any named plaintiff was HIV-positive, was interested in a food-service job, or applied for one).

Here, the district court found as a fact, based on the record before it, that "Oloyede's qualifications are sufficient to allow [him] to proceed to the next step of UPS's driver evaluation and training." The district court based this ultimate conclusion on, inter alia, its finding that Oloyede's driving record at the time of trial satisfied the "clean driving record" requirement in the pertinent UPS district, which states that individuals must have no accidents or moving violations within the previous year, no convictions for driving while intoxicated within the previous three years, and no more than three moving violations in the previous three years.

In addition, the district court found that Oloyede has been employed by UPS since 1991 and that he first bid on a driving

position in 1998, when, the record establishes, he held a job from which he was qualified to bid on a driver position.[10] Oloyede has bid on or expressed an interest in driving positions several times since then, most recently in 2003. Oloyede currently has an "Article 22.3" position, which, according to the record, means that he is currently contractually barred from bidding on driving positions. The district court found, however, that in 2000, Oloyede's supervisor told him that he would need to pass a hearing exam to become a package-car driver. The court further found that, in general, "[i]f an applicant cannot satisfy the DOT hearing standard, he or she will not be allowed to move on to UPS's driver training," indicating that no direct assessment of Oloyde's driving ability was ever made.

[3] That Oloyede is not currently employed in a position from which he is eligible to bid for a driving job is of no moment. Oloyede was informed that he could not drive for UPS under any circumstances. As a result, he was deterred from remaining in a driver-eligible position and sought instead to advance his career in some other fashion. An individual thus influenced by an allegedly discriminatory policy to avoid humiliating circumstances — here, languishing in a dead-end position — is still aggrieved by that policy if he maintains a continuing interest in the benefit to which access has been denied — here, the opportunity to be individually assessed for the package-car driver position. That Oloyede accepted a position prohibiting him from applying for a job he knew he could not have does not detract from the conclusion that he was injured by the policy he challenges. *See Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137-38 (9th Cir. 2002) (holding that a disabled individual deterred from patronizing a public accommodation due to a defendant's fail-

___

[10]The class certified by the district court covers individuals who "have been employed by and/or applied for employment with United Parcel Service (UPS) at any time since June 25, 1997 up through the conclusion of this action."

ure to comply with the ADA has suffered an "injury in fact"); *cf. Teamsters*, 431 U.S. at 365 ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.").[11] How Oloyede's injury is to be remedied if found to result from a violation of the ADA is a question to be addressed at the relief stage, but does not affect his ability to challenge the DOT standard that stood in the way of his desired advancement.[12]

## B.   Driving "Safely"

UPS suggests that *beyond* compliance with prerequisites unconnected to the DOT standard, Bates also bears the burden of proving that at least one individual in the class was a "qualified individual with a disability" in the sense of being able to perform the "essential function" of driving "safely." We reject that contention as inconsistent with the language of the ADA.

---

[11]UPS also maintains that there is no "evidence in the record that Oloyede had the requisite seniority to drive at his facility before becoming an Article 22.3 employee." This fact, even if true, is also of no moment, as UPS's policy does not require a certain level of seniority, but rather encompasses a seniority preference.

[12]For similar reasons, UPS's contention that the "claims or defenses" of Oloyede are not "typical of the claims or defenses of the class," as required by Federal Rule of Civil Procedure 23(a)(3), fails. Citing *East Texas Motor Freight System, Inc. v. Rodriguez*, UPS contends that Oloyede must be "qualified" in the sense that he satisfied the basic prerequisites for the driving position and thus is "typical" of the class and subclass he seeks to represent. *See* 431 U.S. 395, 403 (1977).

We review class certification decisions for abuse of discretion, *see Smith v. Univ. of Wash., Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000), and hold — for the reasons recited in the text — that the district court did not abuse its discretion by finding Oloyede qualified in the pertinent sense and hence "typical."

## 1.  Statutory Provisions and UPS's Contentions

Subsection (a) of § 12112 of the ADA, headed "General rule," provides the following: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[13] Subsection (8) of § 12111 defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8).

Subsection (b) of § 12112, headed "Construction," states that "[a]s used in subsection (a) of this section, the term 'discriminate' includes" seven types of employer actions — as pertinent here,

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.[14]

42 U.S.C. § 12112(b)(6).

Section 12113(a), headed "In general," describes the defenses available to employers:

[13]The parties agree that UPS is a "covered entity" within the meaning of § 12111(2), (5) and that individuals who cannot pass the DOT hearing standard are "disabled" within the meaning of § 12102(2).

[14]Bates does not challenge UPS's standard under § 12112(d), which covers in detail the propriety of medical examinations under the ADA. We therefore do not reach how § 12112(d) might apply in the present case.

It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

**[4]** UPS's hearing standard is clearly a "qualification standard[ ] . . . that screen[s] out . . . a class of individuals with disabilities," § 12112(b)(6). On its face, the standard excludes individuals whom the parties agree are "disabled" from consideration for driving positions. Thus, UPS's use of the hearing standard is "discrimination" under § 12112(b)(6), "unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity." § 12112(b)(6).

**[5]** The word "unless" suggests that UPS bears the burden under § 12112(b)(6) of establishing that the standard is job-related and consistent with business necessity. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (stating the "general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits" (internal quotation marks omitted)). We have noted that "the two versions of the general business necessity defense," in §§ 12112(b)(6) and 12113(a), are "intended to encompass the same basic requirements," *Morton*, 272 F.3d at 1257 n.8, and have held that the burden of proving that a qualification standard is job-related and consistent with business necessity under § 12113(a) falls squarely on the defendant, *see id.* at 1258; *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001). It follows that the defendant has the burden of establishing that a qualification standard is job-

related and consistent with business necessity under *both* §§ 12112(b)(6) and 12113(a).

UPS argues, however, that even if this is so, plaintiffs must first establish that the challenged standard excludes individuals who can perform the "essential function" of driving "safely." UPS's argument is premised on: (1) § 12112(a)'s statement that "[n]o covered entity shall discriminate against a *qualified* individual with a disability"; (2) § 12111(8)'s definition of "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"; and (3) our cases holding that plaintiffs ordinarily must establish that they are "qualified individuals with disabilities." *See, e.g.*, *Kennedy*, 90 F.3d at 1481. If UPS were correct, then, as a practical matter, the plaintiff would bear the burden of proving that a categorical and specific safety qualification is *not* valid under the statute, by showing that at least some individuals who cannot meet it are capable of driving safely. That distribution of the burden of proof in a case such as this one is incompatible with the statutory scheme.

## 2.   Statutory Analysis

Section 12112(a) does not stand alone in the ADA. Section 12112(b), which includes § 12112(b)(6), is headed "Construction"[15] and begins with, "As used in subsection (a) . . . the term 'discriminate' includes . . . ." Section 12112(b)(6) thus describes one instance of what constitutes unlawful "discriminat[ion]" under the statute — "using qualification standards . . . that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities

---

[15]While "the heading of a section cannot limit the plain meaning of the text," "[f]or interpretative purposes, [the heading of a section is] of use . . . when [it] shed[s] light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947).

unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity."

Critically, § 12112(b)(6) and its parallel affirmative defense, § 12113(a), apply where "an individual with a disability," *not* a "qualified individual with a disability," is excluded. It is this statutory provision, and not the ones UPS cites, that properly guide our analysis. Plaintiffs thus do not bear the burden under § 12112(b)(6) of proving that individuals who cannot meet the qualification standard nevertheless are "qualified" with regard to the essential job function the standard addresses — here, safety.[16]

We took a similar approach to interpreting another provision of the ADA in *Fredenburg v. Contra Costa County Department of Health Services*, which held that individuals need not be "qualified individuals with disabilities" to bring a challenge to a medical examination under § 12112(d)(4). 172 F.3d 1176, 1182 (9th Cir. 1999). We so held even though Section 12112(d)(1) provides that "In general," "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." *Fredenburg* emphasized that the particular prohibition contained in Section 12112(d)(4) concerning medical examinations "refer[s] to 'employees' . . . not 'qualified individuals with a disability.' " *Id.* Here, as in *Fredenburg*, the directly pertinent statutory section does not refer to "qualified individuals with disabilities." Rather, that section — § 12112(b)(6) — refers to "*individuals* with disabilities." (emphasis added).

---

[16]Moreover, the ability to drive "safely," while critically important for a commercial driver, is not a self-defining quality. All employers tolerate *some* risk of vehicle accidents, and each evaluates that risk in its own way. Where, as here, the employer bars employees because of their disability from any individualized assessment of their safe driving ability, employees cannot be expected to establish through *different* criteria, *not* used by the employer, that they are safe to some unspecified degree.

We recognize that § 12112(b) states that "[a]s used in subsection (a), the term 'discriminate' includes" the employer actions described in subsections (b)(1) through (b)(7). One might argue, therefore, that § 12112(b)(6) elaborates only on the single word "discriminate" used in § 12112(a), and that § 12112(a)'s requirement that discrimination be directed against "qualified individuals with disabilities" still applies even when § 12112(b)(6) — or any other subsection of § 12112(b) — is at issue. Examination of the other subsections of § 12112(b) and of the role of § 12112(b)(6) in the statute as a whole leads us to conclude that this understanding of the statute is untenable.

First, the imposition of a requirement that all ADA Title I plaintiffs initially establish that they are "qualified individuals with disabilities" would be utterly incoherent with regard to one of the other subsections, § 12112(b)(4). That section prohibits discrimination against a "qualified individual" known to associate with an individual with a disability. Section 12112(b)(4) thus protects qualified individuals who do not themselves have disabilities and thus could not possibly meet any general "qualified individual with a disability" requirement.

Second, if the statute is viewed as ambiguous because of the "qualified individual with a disability" language in § 12112(a), the relevant legislative history supports our conclusion regarding the interaction of § 12112(a) and 12112(b)(6). *See Coeur d'Alene Tribe v. Hammond*, 384 F.3d 674, 692 (9th Cir. 2004) (providing that we may consult legislative history if a statutory provision is ambiguous), *cert. denied*, 543 U.S. 1187 (2005). Especially instructive are the committee reports, which the Supreme Court has said are "authoritative source[s] for finding the Legislature's intent." *Garcia v. United States*, 469 U.S. 70, 76 (1984). The committee reports discuss the section of the ADA codified as § 12112(b)(6) and treat § 12112(b)(6) as a stand-alone provision, making no reference to the "qualified individual with a

disability" language in § 12112(a).[17] For example, the report of the House Judiciary Committee described the section codified at § 12112(b)(6) by noting:

> This section prohibits the use of qualification standards, employment tests or other selection criteria that screen out or tend to screen out *persons with disabilities*, unless the criteria are shown to be jobrelated [sic] and consistent with business necessity.
>
> If an employer uses a facially neutral qualification standard, employment test or other selection criterion that has a discriminatory effect on *persons with disabilities,* this practice would be discriminatory unless the employer can demonstrate that it is jobrelated [sic] and required by business necessity.

H. REP. NO. 101-485, pt. 3, at 42 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 445, 465 (emphases added); *see also* S. REP. NO. 101-116, at 37 (1989) ("If a *person with a disability* applies for a job and *meets all selection criteria except one that he or she cannot meet because of a disability*, the criteria [sic] must concern an essential, non-marginal aspect of the job, and be carefully tailored to measure the person's actual ability to do this essential function of the job." (emphases added)); S. REP. NO. 101-116, at 27 ("[T]his legislation pro-

---

[17]The pertinent EEOC guidance similarly treats § 12112(b)(6)'s prohibition against inadequately justified qualification standards as an independent statutory requirement:

> [J]ob criteria that even unintentionally screen out, or tend to screen out, an individual with a disability or a class of individuals with disabilities because of their disability may not be used unless *the employer* demonstrates that that criteria, as used by the employer, are job-related to the position to which they are being applied and are consistent with business necessity.

29 C.F.R. pt. 1630 app. (Section 1630.10) (emphasis added).

hibits use of a blanket rule excluding *people with certain disabilities* except in the very limited situation where in all cases physical condition by its very nature would prevent the person with a disability from performing the essential functions of the job, even with reasonable accommodations." (emphasis added)).

Particularly significant is the report of the House Committee on Education and Labor, which states:

> The Committee intends that the burden of proof under [the sections that were codified at § 12112(b)(1), (5)-(6)] be construed in the same manner in which parallel agency provisions are construed under Section 504 of the Rehabilitation Act as of June 4, 1989. See, e.g., . . . 29 C.F.R. 32.14 (Department of Labor).

H. REP. NO. 101-485, pt. 2, at 72 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 354; *see also* H. REP. NO. 101-485, pt. 3, at 42 n.32. The cited regulation places the burden on employers

> to ensure that to the extent job qualifications tend to exclude *handicapped individuals* because of their handicap, they are related to the performance of the job and are consistent with business necessity and safe performance. . . . *The recipient shall have the burden to demonstrate that it has complied with the requirements of this paragraph.*

29 C.F.R. § 32.14 (1988) (emphases added); *see also Bentivegna v. U.S. Dep't of Labor*, 694 F.2d 619, 621-22 (9th Cir. 1982) (applying 29 C.F.R. § 32.14). To place on Bates the burden of demonstrating that the DOT standard excludes some individuals who can drive "safely" cannot be squared with this preexisting regulation.

As UPS points out, many of our cases have stated in general terms that ADA plaintiffs bear the burden of establishing that they are "qualified individuals with disabilities." *See, e.g.*, *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 892 (9th Cir. 2001); *Kennedy*, 90 F.3d at 1481. *See also Dark v. Curry County*, 451 F.3d 1078 (9th Cir. 2006); *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("An ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'— that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." (quoting 42 U.S.C. § 12111(8))). These cases, however, have, for the most part, not concerned challenges to a categorical qualification standard under §§ 12112(b)(6) and § 12113(a) and thus do not take account of how plaintiffs' burdens are different when those provisions apply. *See, e.g.*, *Hutton*, 273 F.3d at 889 (determining whether a particular employee was a "direct threat" under § 12113(b)); *Weyer*, 198 F.3d at 1108 (determining whether a provision in an employer's disability policy violated the ADA); *Kennedy*, 90 F.3d at 1481 (considering an employment termination claim where no qualification standard was at issue); *see also Dark*, 451 F.3d at 1086 (same); *Cleveland*, 526 U.S. at 806 (same).[18] *Cripe* and *Morton*, our two cases that *have* considered qualification standards, are consistent with the approach we adopt today.

---

[18]Other circuits have held that when the "direct threat" defense in § 12113(b) applies, plaintiffs have the burden to establish they can perform their jobs safely as part of their burden to prove they are "qualified individuals with disabilities," if safe job performance is an "essential function" of the position. *See, e.g.*, *McKenzie v. Benton*, 388 F.3d 1342, 1355-56 (10th Cir. 2004), *cert. denied*, 544 U.S. 1048 (2005); *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997). In our circuit, however, the direct threat defense is *distinct* from the business necessity defense and applies only when the safety-based reason for excluding an employee is "*not* for reasons related to their performance of their jobs." *Morton*, 272 F.3d at 1259. Thus, the circumstances in which a plaintiff bears the burden of establishing she can perform her job safely in those other circuits — when performing her job "safely" is an "essential function" — never arise in our circuit in the context of the direct threat defense.

*Cripe* states that "[t]he ADA prohibits employment discrimination only against 'qualified individual[s]' with disabilities" and that "[i]f a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." 261 F.3d at 884 (alteration in original) (quoting § 12112(a)). In *Cripe*, however, the dispute about whether the plaintiffs were "qualified individuals with disabilities" concerned *not* whether they could safely perform the job functions in question — it was clear that they could not — but whether the job functions they could not perform were *essential* to the desired positions.[19] *See id.* at 885. There was no reason in *Cripe* to consider the burdens of proof with regard to whether or not a prescribed qualification standard the employer used to assess the ability to perform a job safely discriminated on the basis of disability. *Cripe*, therefore, did not consider the question we address today.

*Morton* followed *Cripe* and, in large part, forecast the resolution of the burden of proof question we adopt today. In *Morton*, UPS did *not* contend that Morton had to show that she was a "qualified individual with a disability" in the sense that she could drive "safely." Instead, UPS made its argument that deaf drivers cannot drive safely *only* as part of its "business necessity" defense, and *Morton* proceeded to address the safety issue only in that context. 272 F.3d at 1257. In contrast, *Morton* treated a separate qualification-standard issue — whether an essential function of any driving position was being able to drive *any* UPS vehicle — in the same manner as *Cripe* had handled the parallel question. *See id.* at 1254. As

---

[19]UPS makes much of *Cripe*'s statement that "we" would "*first* consider whether the plaintiffs are . . . 'qualified individuals,' " and "we" would "*then* consider the City's argument that . . . the policies are 'job-related' and 'consistent with business necessity.' " 261 F.3d at 886 (emphasis added). That statement indicated only the order in which in the opinion considered the issues. It did not indicate that plaintiffs always bear the burden of proof on the first issue, even when an asserted qualification is challenged as discriminatory under § 12112(b)(6).

*Morton* came after *Cripe*, the distinction in *Morton*'s approach to two different "qualified individual with disability" issues confirms our understanding that *Cripe* is fully consistent with today's holding.

Indeed, *Morton* necessarily assumed the result we reach today. *Morton* held that when a safety-related qualification standard that excludes a class of individuals with disabilities is at issue, the employer satisfies its burden under the business necessity defense if it can show that either (1) "substantially all [excluded individuals with disabilities] present a higher risk" than individuals not excluded, or (2) "there are no practical criteria for determining which [excluded individuals with disabilities] present a heightened risk and which do not." *Id.* at 1263. Were we to hold that Bates bears the burden of establishing that at least some deaf individuals are capable of driving safely, the *Morton* affirmative defense would be rendered almost entirely pointless. It necessarily follows from a showing that the policy excludes some individuals capable of performing the job safely that it is not true that "substantially all" individuals excluded by the qualification standard present a higher-than-normal risk.[20] And if a plaintiff illustrates that a qualification standard excludes individuals capable of safely performing the essential functions of a job, she has demonstrated that there *are* "criteria for determining which [excluded individuals with disabilities] present a heightened risk and which do not." *Id.*

### 3.   Summary

[6] We therefore hold that when a plaintiff challenges a categorical "qualification standard," the plaintiff does not have the burden of establishing that *that* qualification standard excludes "qualified individuals with disabilities." Rather, to establish statutory standing, the plaintiff has the burden of

---

[20]We read the word "substantially" to express the notion that the proof that all excluded individuals are unsafe need not be air-tight.

establishing that she meets *other* qualifications, unrelated to the challenged standard. In addition, the plaintiff has the burden to prove that the challenged qualification standard "screen[s] out or tend[s] to screen out an individual with a disability or a class of individuals with disabilities." § 12112(b)(6). The burden then shifts to the employer to establish the business necessity defense.[21]

Two observations about this holding are in order. First, by holding that plaintiffs challenging a qualification standard do not have the burden of establishing that the standard excludes "*qualified* individuals with disabilities," we are in no way suggesting that the ADA requires employers to hire unqualified individuals with disabilities. To the contrary, the business necessity defense ensures that employers will *not* be required to hire unqualified individuals, but channels the qualification inquiry in part into an affirmative defense.

Second, the burden-shifting framework we apply today per-

---

[21]We note that our understanding of the parties' burdens of proof in a case such as this one is consistent with that of the most similar case we have found, *Monette*. In *Monette*, the Sixth Circuit held:

> [I]f the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:
>
> > 1) The plaintiff bears the burden of establishing that he or she is "disabled."
> >
> > 2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.
> >
> > 3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

90 F.3d at 1186.

tains to cases testing whether an employer may use a particular qualification standard, not to cases testing whether an employer must hire a particular individual. If a court finds against an employer under the framework outlined in this opinion, it follows only that the employer may not use the qualification standard, not that a person challenging the standard must be hired. The usual statutory standards apply when an employer does not apply a categorical exclusion that precludes disabled persons from ever obtaining an individualized determination but instead makes an individualized determination.

## IV.   Business Necessity Defense

UPS contends that even if the district court was correct in its allocation of the evidentiary burdens and in its finding that Oloyede met the threshold qualifications, UPS is entitled to judgment because it satisfied its burden under the business necessity defense. Reviewing the district court's extensive findings of fact for clear error and for consistency with the legal requisites of the business necessity defense, we do not agree.

To repeat: Under *Morton*'s two-pronged test for determining whether a defendant satisfies its burden on the business necessity defense when a disability-focused safety criterion is at issue, a defendant carries its burden if it establishes that either (1) "substantially all [deaf drivers] present a higher risk of accidents than non-deaf drivers," or (2) "there are no practical criteria for determining which deaf drivers present a heightened risk and which do not." 272 F.3d at 1263. We examine each prong in turn.

### A.   First Prong

The parties introduced three kinds of evidence pertaining to the extent to which deaf drivers pose an increased safety risk as compared to hearing drivers: crash risk studies, a human-

factors study, and expert testimony regarding "channel capacity." The district court found that UPS did not establish that "substantially all [deaf drivers] present a higher risk of accidents than non-deaf drivers." This finding was not clearly erroneous.

### 1.    Summary of District Court Findings

The district court first considered the crash risk studies and concluded that they both suffered from methodological flaws and yielded conflicting results about the extent to which deaf drivers were more dangerous than hearing drivers. The district court further noted that the one study that both parties agreed was the *least* methodologically flawed found that deaf males had 1.8 times the number of accidents as hearing males, but that there was no significant difference in accident rates between deaf and hearing females. Citing *Morton*, which had considered the same study, the district court concluded that "the gender anomaly serves to "negate[ ] any conclusion that all or substantially all deaf drivers present a heightened risk of accidents." (alteration in original) (quoting *Morton*, 272 F.3d at 1264).

In addition, the district court noted that because the studies comparing "deaf" and "hearing" drivers used varying criteria to classify drivers as "deaf," none of which corresponded to the DOT standard, the studies did not capture the risk differential between individuals who fail the DOT standard and individuals who pass the DOT standard. Finally, the district court observed that the risk studies were dated and that technological advances and advances in driver training in the intervening decades cast doubt on their results.

The district court next considered the "human factors study" relied on by UPS. That study was based both on interviews with "subject matter experts" and on questionnaires completed by eighty hearing truck drivers. The court found that the study's conclusion that "hearing is both important and

necessary for the safe operation of commercial vehicles" was not persuasive, because the study's conclusions were based on the subjective beliefs of hearing drivers. Neither the subjective beliefs of deaf drivers nor the ways in which deaf drivers compensate for their hearing loss was considered. In addition, the district court found this study not relevant to the question at hand, as it merely demonstrated the existence of "hearing critical" tasks but did not establish a link between those tasks and safety.

Finally, the court considered evidence about "channel capacity" theory, which holds that there are limits to the amount of information an individual can process through any given sense. The court was not persuaded by the testimony of UPS's expert that he had "very strong doubts" that providing deaf drivers with additional visual cues, such as visual warnings of sirens, could be effective in compensating for hearing loss. Having "very strong doubts" did not satisfy UPS's burden, said the district court, nor were the expert's doubts grounded in empirical evidence or any personal experience with deaf drivers. To the contrary, the court noted, the expert was not aware of any studies investigating whether technological devices might allow deaf drivers to compensate effectively for their hearing impairments, nor was he aware of any studies investigating whether deaf drivers are able to compensate effectively without the aid of technological devices.

After surveying this evidence, the district court stated that "all other things being equal, a driver with perfect hearing would likely pose less of a safety risk than a driver with impaired hearing" and that "there are, in theory at least, situations where a hearing driver would avoid an accident while a deaf driver, with all of the same training and skills except for hearing, would not." The district court noted, however, that "[t]his does not . . . answer the question of whether UPS's application of the DOT hearing standard to non-DOT-regulated vehicles is consistent with business necessity," reasoning:

UPS had failed to demonstrate that those situations where hearing alone makes the difference between an accident and avoiding an accident would ever be confronted by a UPS package-car driver. While UPS offered anecdotal testimony involving situations where a driver avoided an accident because he or she heard a warning sound, the company, as discussed above, failed to show that those accidents would not also have been avoided by a deaf driver who has compensated for his or her loss of hearing by, for example, adapting modified driving techniques or using compensatory devices such as backing cameras or additional mirrors.

In addition, the district court observed that even if the evidence established that

a hearing driver would pose less of a safety risk than a driver with the exact same characteristics and training but with impaired hearing, that would not establish that *all or substantially all* deaf drivers pose a heightened safety risk compared with hearing drivers. This one-to-one comparison is of little use in answering the question at hand because it does nothing to establish whether there is a significant portion of deaf drivers who are able to drive as safely as or more safely than the *typical* hearing driver.

(second emphasis added).

Along the same lines, the district court noted that to satisfy UPS's burden, statistics about accident rates of deaf drivers alone would be insufficient. Rather, "UPS must show that deaf drivers pose a greater safety risk than that already accepted by the company." The court noted that the evidence revealed that UPS tolerates some level of risk among its drivers, citing accident-rate statistics and UPS policies that permit drivers who have had accidents to continue as UPS drivers.

The court observed that UPS had not demonstrated that deaf drivers posed a greater risk of accidents than that tolerated for hearing drivers.

The district court next rejected the proposition that the mere existence of the DOT standard supports UPS's assertion that hearing is necessary to drive non-DOT-regulated vehicles safely, observing that the Ninth Circuit had squarely rejected this argument in *Morton*. *See Morton*, 272 F.3d at 1263-64. Moreover, the district court noted that UPS's argument that the same physical standards should apply to non-DOT-regulated vehicles at issue because such vehicles pose the same risk of danger as DOT-regulated vehicles was not supported by the evidence:

> [T]he DOT itself previously considered and rejected this argument, finding that "[m]ost vehicles having a GVWR of 10,000 pounds or less have operating characteristics similar to a large automobile and generally pose no greater safety risk than other vehicles of similar or lesser weight when used on the highway."

(quoting 53 Fed. Reg. 18,042 (1988)) (second alteration in original).

Finally, the district court observed that UPS had not shown that it was impossible to conduct a valid study comparing the relative risks posed by deaf drivers, pointing out that there is no evidence in the record of an insufficient number of deaf commercial drivers in the United States to conduct such a study and noting that even if there were, UPS could conduct a study on deaf commercial drivers in other countries, on deaf passenger-car drivers, or by using computer simulators.

After this extensive analysis of the evidence, the district court concluded that "the evidence is inconclusive as to whether deaf drivers pose an increased risk compared with

hearing drivers." It went on to state that "[b]ecause UPS bears the burden of proving business necessity, the lack of conclusive evidence requires the Court to rule against the company; UPS simply has not proven that all or substantially all deaf drivers pose an increased safety risk."

## 2.   Analysis

**[7]** The district court did not clearly err in finding that UPS failed to show that deaf drivers pose a greater risk than other drivers hired by the company. The district court carefully evaluated the underlying record before finding that "UPS has failed to demonstrate that those situations where hearing alone makes the difference between an accident and avoiding the accident would ever be confronted by a UPS package car driver." In so doing, the court determined that: (1) the crash-risk studies UPS presented were methodologically flawed and generally unhelpful; (2) the human factors study was not persuasive because it relied on the subjective impressions of hearing drivers; and (3) the expert testimony relating to channel capacity was both indistinct and not well-grounded. Because none of these predicate findings were clearly erroneous, neither was the district court's ultimate finding of fact that UPS did not establish that deaf drivers are less safe than hearing drivers.

**[8]** The district court's findings are also fully consistent with the business necessity defense. That defense requires that the defendant establish one of two propositions: (1) that substantially all deaf drivers present an unacceptable risk of danger — i.e., substantially all individual deaf drivers present a risk greater than the risk per driver already accepted by UPS, or (2) that there is no practical way to determine which deaf drivers present an unacceptable risk of danger. Hence, evidence that a hearing driver is generally safer than a deaf driver with similar skills and characteristics — i.e., evidence of the sort that UPS presented to the district court — still does not address the question of whether there are *some* deaf driv-

ers who are as safe or safer than some or all of the hearing drivers that UPS employs.

It is this latter comparison that is key. Otherwise, UPS would be allowed to exclude — contrary to the ADA — deaf drivers who are no more dangerous than some hearing drivers UPS employs and who *can* be identified by UPS as presenting an acceptable risk of danger. The concept of risk, in other words, is an individual, not an aggregate, one, albeit one calculated by averaging out overall risk: How likely is it that the individual driver will get into an accident? If there is, for example, a one percent chance that hearing drivers who have had two prior accidents will get into an accident, yet UPS hires them, and a one percent chance that deaf drivers generally will get into an accident, then excluding deaf drivers generally is excluding a subgroup no less safe than another subgroup not excluded, and is therefore discriminatory. *Cf. UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 220 (1991) (White, J., concurring in part and concurring in the judgment) (stating that to determine whether a company may justify a sex-differentiated policy on the ground that the policy's purpose is risk avoidance, courts must "consider the level of risk avoidance that was part of [the employer's] 'normal operation' "). The district court's holding thus correctly interpreted *Morton* and its instruction that "the level of risk that UPS accepts for drivers generally and for ascertainable subgroups of drivers is pertinent" to the business necessity inquiry. *Morton*, 272 F.3d at 1265.

That is not to say that there might not be some subgroup of deaf drivers — deaf drivers with two previous accidents, perhaps — who are more risky than any of the hearing drivers UPS hires. And UPS certainly could decrease its overall level of risk, if it wishes, by toughening its per-driver safety standards generally. UPS, however, cannot decrease its overall risk by excluding all deaf drivers because of the incremental *aggregate* additional risk they assertedly pose, without showing any *individualized* risk that is beyond the risk already

accepted for some hearing drivers (or, as we develop next, showing that it is impossible to isolate such an increased individualized risk). To do so would be the essence of the discrimination the ADA seeks to eliminate.

[9] In sum, the district court's conclusion that the evidence was inconclusive on the question of whether "substantially all [deaf drivers] present a higher risk of accidents than non-deaf drivers," *Morton*, 272 F.3d at 1263, was not clearly erroneous.

## B.   Second Prong

### 1.   Summary of District Court Findings

To satisfy the second prong of the business necessity test, UPS had to demonstrate that "there are no practical criteria for determining which deaf drivers present a heightened risk and which do not." *Id*. UPS could establish that no such practical criteria exist by demonstrating, inter alia, that "empirical evidence in this area is so difficult to come by that it is impossible to identify specific risk factors and then use those factors to sort disabled applicants into risk categories." *Id.* at 1265.

The district court, in its extensive findings of fact regarding prong two, determined that UPS failed to prove that it could not modify its existing training and assessment program to determine which deaf drivers are safe. Nor, held the district court, did UPS demonstrate the inefficacy or impracticality of several other "obvious" criteria for evaluating the safety of drivers. Such criteria, the district court noted, might include (1) "whether the applicant has had the benefit of rehabilitative or specialized driver training to compensate for the impairment"; (2) "whether the applicant has a sustained driving record (with the impairment), indicating he or she has successfully overcome the impairment"; (3) "whether the applicant has previously successfully driven commercial delivery vehicles . . . with the impairment"; and (4) whether the applicant has passed a "supplemental driving test specifically

designed to simulate the scenarios of concern." (internal quo-
tation marks omitted) (quoting *EEOC v. United Parcel Ser-
vices, Inc.*, 149 F. Supp. 2d 1115, 1170 (N.D. Cal. 2000),
*rev'd on other grounds*, 306 F.3d 794 (9th Cir. 2002)). The
court additionally found that "UPS has never tried to train a
deaf driver, nor has it ever investigated ways in which it
might do so."

In addition, the court found the testimony of Dr. Songer,
one of Bates's expert witnesses, not dispositive, UPS's con-
tention to the contrary notwithstanding. Dr. Songer testified
that:

> There is no evidence available at this point that can
> point to characteristics amongst individuals who are
> deaf or hearing impaired that say that this one may
> be more likely to crash because of the hearing
> impairment than another one. There's other things
> you could do that are unrelated to hearing that may
> be potentially helpful. But with respect to hearing,
> there's nothing we know at this point in time.

UPS argued to the district court that Dr. Songer's testimony
proved the ultimate issue under prong two — whether it was
possible to distinguish among deaf individuals to determine
which individuals posed a heightened risk of accident. The
court rejected UPS's arguments, because, read in context, Dr.
Songer's testimony suggested only

> that it would be impossible to say, for example,
> whether an individual who is profoundly deaf would
> be more or less likely to crash because of that
> impairment than someone who has a lesser degree of
> hearing impairment, or whether an individual who
> was born with a hearing impairment would be more
> or less likely to crash because of that impairment
> than someone who acquired a hearing impairment
> later in life. The Court does not find this testimony

to be dispositive of the ultimate legal issue because it fails to address whether UPS's driver assessment and training programs or other similar tools could be effectively applied to screen deaf drivers.

## 2. Analysis

The district court's findings on the second prong of the business necessity test, like its findings on the first, are not clearly erroneous and are free of legal error.

First, the district court's interpretation of Dr. Songer's remarks, upon which UPS heavily relies in its appeal, was not clearly erroneous: Dr. Songer stated that "[t]here is no evidence available at this point that can point to characteristics amongst individuals who are deaf or hearing impaired that say that this one may be more likely to crash *because of the hearing impairment*" and immediately thereafter noted that "[t]here's [sic] other things you could do that are *unrelated to hearing* that may be potentially helpful." (emphasis added).[22] So Dr. Songer's testimony establishes only that certain kinds of evidence are not available, not that there exist *no* criteria for determining which deaf individuals present an unduly high risk. Similarly, while Dr. Songer testified that it would not be possible to do a general study of whether deaf drivers are safe to drive commercial vehicles without modification of DOT regulations precluding deaf individuals from driving many such vehicles, that testimony does not address the pertinent

---

[22]UPS's expert, Dr. Staplin, testified that there are no proven mechanisms for determining which deaf individuals might pose a heightened risk. That testimony does not, however, provide support for this proposition. Dr. Staplin did not make any statements that could be construed as supporting the proposition that there is no other way to screen drivers to determine who will be safe. He also "agree[d] that DMV screening, that is, the examination of violation and crash records, has importance in identifying individuals who may be at increased risk of a crash," thus indicating that there *are* ways that could help determine which deaf drivers are more likely than other drivers to crash.

question for this case. DOT regulations preclude studies of deaf drivers of *DOT-regulated* vehicles, not studies of deaf drivers of vehicles *not regulated by the DOT*, the vehicles at issue in the present case.

**[10]** Second, under *Morton*, it is the employer who must establish (1) that there exist no practical criteria for determining which deaf drivers are safe, or (2) that there exists no empirical evidence from which to derive criteria for determining which deaf drivers are safe. *See* Morton, 272 F.3d at 1265 ("If UPS were able to show that empirical evidence in this area is so difficult to come by that it is impossible to identify specific risk factors and then use those factors to sort disabled applicants into risk categories, then its application of an over-inclusive qualification standard might meet the business necessity test."). Here, several possible criteria for distinguishing among deaf drivers and several sources of empirical evidence from which to derive such criteria are apparent. UPS had the burden at least to introduce evidence tending to show that no such criteria are practical or effective or no such evidence is obtainable. Because UPS entirely failed to do so, presenting essentially no evidence on this critical question, it did not satisfy its burden under prong two of the business necessity test.

For example, UPS uses driving records to aid in predicting whether individuals will be safe drivers, excluding from consideration for package-car driving positions individuals who, inter alia, have more than a specified number of moving violations or accidents in a particular period of time. Absent *some* persuasive explanation as to why similar criteria could not be used to separate safe from unsafe deaf drivers, the district court was entitled to conclude that UPS had not met its burden of demonstrating that there are no practical criteria available.[23] Similarly, UPS gives driving tests and extensive train-

---

[23]The district court rejected UPS's contention that deaf drivers who have violated the law receive citations less often than hearing drivers and that driving records of deaf drivers are therefore unreliable. On appeal, UPS does not challenge that conclusion.

ing to prospective drivers, presumably because doing so helps in assessing which applicants will drive safely. Yet, the record does not address the reasons similar tests and training could not determine which deaf drivers, if any, present no greater risk of accidents than the risk UPS accepts for other drivers. Of particular significance in these regards is that deaf drivers are licensed to drive passenger cars in every state and do, including vehicles as large as the smaller UPS package cars. There is therefore no legal impediment to assessing and training deaf drivers, and both driving and accident-rate records for deaf drivers seeking UPS driving jobs are obtainable.

[11] UPS's challenge to the district court's findings under prong two therefore fails. And, because UPS did not satisfy its burden on either prong, it failed to establish that its use of the hearing standard is job-related and consistent with business necessity. UPS therefore violated the ADA.

\* \* \* \* \*

We underscore that our holding turns entirely on UPS's failure to adduce any persuasive proof suggesting that its standard is justified as job-related and consistent with business necessity. UPS contends that in the face of uncertainty regarding whether deaf drivers are more dangerous than hearing drivers, it must be given the benefit of the doubt. The second prong of the business necessity defense in *Morton does* give employers the benefit of the doubt in cases of uncertainty, but only when the employers introduce persuasive evidence supporting the conclusion that the answers to the questions at hand truly are uncertain. Here, UPS made no such showing.

## V.   Injunction

UPS next challenges the terms of the injunction issued by the district court. Under the ADA, courts have the power to

> enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative

> action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1) (incorporated into the ADA by 42 U.S.C. § 12117). We review the terms of an injunction for abuse of discretion. *Walters v. Reno*, 145 F.3d 1032, 1049 (9th Cir. 1998); *see also Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995).

Here, the injunction contains two elements. First, the order states that "UPS shall cease using the DOT hearing standard to screen applicants for package-car driving positions" but noted that "nothing in this order requires UPS to allow applicants who cannot pass the DOT hearing standard to drive vehicles weighing more than 10,000 pounds." Second, the order states that if individuals fail the DOT hearing test but meet all other threshold requirements, "UPS shall perform an individualized assessment" of the ability of those individuals, including engaging in an "interactive process designed to identify specific accommodations that would enable the deaf individual to obtain driving work" in non-DOT regulated package cars.[24]

UPS challenges two aspects of the injunction. First, UPS contends that "the DOT standard is the only proven means of

---

[24]The second element of the injunction applies only to those who fail the DOT test. Thus, UPS may continue to use the DOT standard to determine which drivers' hearing is so evidently adequate as to need no further assessment, but not to exclude any applicant for a position driving vehicles with GVWRs and gross vehicle weights less than 10,001 pounds. We therefore understand the prohibition on "us[ing] the DOT hearing standard to screen applicants" as precluding not all use of the test, but use of the test as a basis for screening applicants out — that is, for excluding them.

screening those deaf drivers who present a genuine risk to safety." This argument is simply a reiteration of UPS's argument on the second prong of the *Morton* test — that there is no way to assess deaf drivers for safety other than the DOT standard. We have upheld as not clearly erroneous and consistent with the applicable legal standards the district court's finding of fact to the contrary. The issuance of injunctive relief premised on a valid factfinding is valid as well.

[12] Second, UPS contends that the injunction requires UPS to use "a new 'specially designed' test to determine deaf driver safety on an individual basis," and contends that this test was "invented by the court" and "has no basis in evidence." The injunction does not, however, require UPS to use any *particular* test for screening deaf drivers. It only prohibits it from categorically excluding deaf drivers from consideration and requires instead, *some* form of individualized assessment. Once the district court concluded that UPS's use of the hearing standard violated the ADA, the court was fully empowered to enjoin that use. *See* 42 U.S.C. § 2000e-5(g)(1) (incorporated into the ADA by 42 U.S.C. § 12117) (giving courts the power to, inter alia, "enjoin the respondent from engaging in such unlawful employment practice").

[13] Given the district court's findings on the merits, the injunction issued intruded into UPS's business practices and discretion to the least degree possible under the ADA. Aside from limiting (but not banning) the use of the qualification standard found invalid and reiterating the statutory accommodation requirement, the injunction leaves it to the company to develop new assessment and training criteria for deaf drivers. Thus, while UPS argues that the district court ignored the Supreme Court's admonition in *Furnco Construction Corp. v. Waters* that "[c]ourts are generally less competent than employers to restructure business practices" 438 U.S. 567, 578 (1978), the district court in fact carefully heeded that admonition. The court merely proscribed the use of an illegal standard, but did not prescribe the use of a particular method

for hiring package-car drivers. We hold that the district court's injunction was not an abuse of discretion.

## VI.   Unruh Act

Finally, UPS argues that the district court erred in finding in favor of Bates on the Unruh Act claim.[25]

The Unruh Act's central substantive statutory provision states that

> [a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

---

[25]UPS also appeals the district court's holding that because UPS violated the ADA, it *a fortiori* violated the FEHA. After the district court issued its decision, however, this court observed in *EEOC v. United Parcel Service, Inc.* that FEHA's "safety-of-others defense has no direct analogue in the ADA" and is broader than the ADA's direct threat defense, its closest analog. *See* 424 F.3d 1060, 1074 n.12. (9th Cir. 2005). UPS now contends that it is not liable under FEHA, arguing, inter alia, that it has satisfied FEHA's safety-of-others defense.

In light of the clarification of the applicable legal standard, we do not review the district court's finding, applying a different legal standard, that UPS violated FEHA. Our holding that UPS violated the ADA is sufficient grounds for affirming the injunction. The district court will have ample opportunity to make findings of fact pertinent to the *EEOC v. United Parcel Service, Inc.* interpretation of the FEHA safety-of-others defense should the distinction between that standard and the ADA business necessity standard prove pertinent at the damages phase of this case. *See* 424 F.3d at 1075 ("FEHA's safety-of-others defense requires an individualized showing that safety would be compromised by each [employee's] performance of driving duties," although "[c]ategorical evidence can be relevant . . . .").

CAL. CIV. CODE § 51(b). Section 51(f) of the Unruh Act states that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 shall also constitute a violation of this section." *Id.* § 51(f) (citation omitted). Bates contends that because UPS violated the ADA, it follows from section 51(f) that UPS also violated the Unruh Act. UPS's contrary argument is that the Unruh Act does not cover employment discrimination claims, section 51(f) notwithstanding, so UPS did not violate the Unruh Act.

**[14]** We recently addressed this precise legal question. *See Bass v. County of Butte*, 458 F.3d 978 (9th Cir. 2006). *Bass* held that a violation of Title I of the ADA, 42 U.S.C. §§ 12111-12117, which covers employment discrimination, is not automatically a violation of the Unruh Act.[26] We therefore reverse the district court's finding that UPS is liable under the California statute.

## VII. Conclusion

We hold that when plaintiffs challenge an employer's use of a safety-based qualification standard, they need not, independently of that challenge, establish generally that they can perform the essential function of doing the job safely. They are, however, required to show they are "qualified" in the sense that they satisfy prerequisites for the position, including

---

[26]A California Court of Appeals had held similarly in *Williams v. Genentech, Inc.*, 42 Cal. Rptr. 3d 585 (Ct. App. 2006). On August 23, 2006, the California Supreme Court granted review of *Williams*. If that court reaches a different conclusion than that reached by this court in *Bass*, our holding here will not be the law of the case. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (writing that a federal appellate court "will follow a state supreme court's interpretation of its own statute in the absence of extraordinary circumstances"); *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (holding that a district court abuses its discretion in applying the law of the case doctrine if "an intervening change in the law [has] occurred"). Instead, the California Supreme Court decision will be binding on any later proceedings as they relate to Bates' Unruh Act claim.

safety-related prerequisites, not connected to the challenged criterion. Once plaintiffs have so demonstrated, and have also shown that the qualification standard "screen[s] out or tend[s] to screen out an individual with a disability or a class of individuals with disabilities," § 12112(b)(6), the burden shifts to the defendant to establish that the challenged qualification standard is job-related and consistent with business necessity.

We affirm the district court's factual finding that UPS failed to carry its burden and its legal conclusion that UPS therefore violated the ADA. We also affirm the district court's injunction and its order denying UPS's motion to decertify the class. Finally, we reverse the district court's finding of liability under the Unruh Act, which we hold does not cover employment discrimination claims.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**